Justice Scalia
delivered the opinion of the Court, except as to Part IV.
We decide whether violation of the “knock-and-announce” rule requires the suppression of all evidence found in the search.
I
Police obtained a warrant authorizing a search for drugs and firearms at the home of petitioner Booker Hudson. They discovered both. Large quantities of drugs were found, including cocaine rocks in Hudson’s pocket. A loaded gun was lodged between the cushion and armrest of the chair in which he was sitting. Hudson was charged under Michigan law with unlawful drug and firearm possession.
This case is before us only because of the method of entry into the house. When the police arrived to execute the warrant, they announced their presence, but waited only a short time — perhaps “three to five seconds,” App. 15 — before turning the knob of the unlocked front door and entering Hudson’s home. Hudson moved to suppress all the inculpatory evidence, arguing that the premature entry violated his Fourth Amendment rights.
The Michigan trial court granted his motion. On interlocutory review, the Michigan Court of Appeals reversed, re *589 lying on Michigan Supreme Court cases holding that suppression is inappropriate when entry is made pursuant to warrant but without proper “ ‘knock and announce.’ ” App. to Pet. for Cert. 4 (citing People v. Vasquez, 461 Mich. 235, 602 N. W. 2d 376 (1999) (per curiam); People v. Stevens, 460 Mich. 626, 597 N. W. 2d 53 (1999)). The Michigan Supreme Court denied leave to appeal. 465 Mich. 932, 639 N. W. 2d 255 (2001). Hudson was convicted of drug possession. He renewed his Fourth Amendment claim on appeal, but the Court of Appeals rejected it and affirmed the conviction. App. to Pet. for Cert. 1-2. The Michigan Supreme Court again declined review. 472 Mich. 862, 692 N. W. 2d 385 (2005). We granted certiorari. 545 U. S. 1138 (2005).
II
The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one. See Wilson v. Arkansas, 514 U. S. 927, 931-932 (1995). Since 1917, when Congress passed the Espionage Act, this traditional protection has been part of federal statutory law, see 40 Stat. 229, and is currently codified at 18 U. S. C. § 3109. We applied that statute in Miller v. United States, 357 U. S. 301 (1958), and again in Sabbath v. United States, 391 U. S. 585 (1968). Finally, in Wilson, we were asked whether the rule was also a command of the Fourth Amendment. Tracing its origins in our English legal heritage, 514 U. S., at 931-936, we concluded that it was.
We recognized that the new constitutional rule we had announced is not easily applied. Wilson and cases following it have noted the many situations in which it is not necessary to knock and announce. It is not necessary when “circumstances presen[t] a threat of physical violence,” or if there is “reason to believe that evidence would likely be destroyed if advance notice were given,” id., at 936, or if knocking and *590 announcing would be “futile,” Richards v. Wisconsin, 520 U. S. 385, 394 (1997). We require only that police “have a reasonable suspicion ... under the particular circumstances” that one of these grounds for failing to knock and announce exists, and we have acknowledged that “[t]his showing is not high.” Ibid.
When the knock-and-announce rule does apply, it is not easy to determine precisely what officers must do. How many seconds’ wait are too few? Our “reasonable wait time” standard, see United States v. Banks, 540 U. S. 31, 41 (2003), is necessarily vague. Banks (a drug case, like this one) held that the proper measure was not how long it would take the resident to reach the door, but how long it would take to dispose of the suspected drugs — but that such a time (15 to 20 seconds in that case) would necessarily be extended when, for instance, the suspected contraband was not easily concealed. Id., at 40-41. If our ex post evaluation is subject to such calculations, it is unsurprising that, ex ante, police officers about to encounter someone who may try to harm them will be uncertain how long to wait.
Happily, these issues do not confront us here. From the trial level onward, Michigan has conceded that the entry was a knock-and-announce violation. The issue here is remedy. Wilson specifically declined to decide whether the exclusionary rule is appropriate for violation of the knock-and-announce requirement. 514 U. S., at 937, n. 4. That question is squarely before us now.
Ill
A
In Weeks v. United States, 232 U. S. 383 (1914), we adopted the federal exclusionary rule for evidence that was unlawfully seized from a home without a warrant in violation of the Fourth Amendment. We began applying the same rule to the States, through the Fourteenth Amendment, in Mapp v. Ohio, 367 U. S. 643 (1961).
*591 Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates “substantial social costs,” United States v. Leon, 468 U. S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been “cautio[us] against expanding” it, Colorado v. Connelly, 479 U. S. 157, 166 (1986), and “have repeatedly emphasized that the rule’s ‘costly toll’ upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application,” Pennsylvania Bd. of Probation and Parole v. Scott, 524 U. S. 357, 364-365 (1998). We have rejected “[indiscriminate application” of the rule, Leon, supra, at 908, and have held it to be applicable only “where its remedial objectives are thought most efficaciously served,” United States v. Calandra, 414 U. S. 338, 348 (1974) — that is, “where its deterrence benefits outweigh its ‘substantial social costs,’” Scott, supra, at 363 (quoting Leon, supra, at 907).
We did not always speak so guardedly. Expansive dicta in Mapp, for example, suggested wide scope for the exclusionary rule. See, e. g., 367 U. S., at 655 (“[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court”). Whiteley v. Warden, Wyo. State Penitentiary, 401 U. S. 560, 568-569 (1971), was to the same effect. But we have long since rejected that approach. As explained in Arizona v. Evans, 514 U. S. 1, 13 (1995): “In Whiteley, the Court treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rulé to evidence secured incident to that violation. Subsequent case law has rejected this reflexive application of the exclusionary rule.” (Citation omitted.) We had said as much in Leon, a decade earlier, when we explained that “[w]hether the exclusionary sanction is appropriately imposed in a particular case ... is ‘an issue separate from the question whether the Fourth Amendment rights of the party seeking *592 to invoke the rule were violated by police conduct.’” 468 U. S., at 906 (quoting Illinois v. Gates, 462 U. S. 213, 223 (1983)).
In other words, exclusion may not be premised on the mere fact that a constitutional violation was a “but-for” cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression. In this case, of course, the constitutional violation .of an illegal manner of entry was not a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house. But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have “never held that evidence is ‘fruit of the poisonous tree’ simply because ‘it would not have come to light but for the illegal actions of the police.’ ” Segura v. United States, 468 U. S. 796, 815 (1984). See also id., at 829 (Stevens, J., dissenting) (“We have not . . . mechanically applied the [exclusionary] rule to every item of evidence that has a causal connection with police misconduct”). Rather, but-for cause, or “causation in the logical sense alone,” United States v. Ceccolini, 435 U. S. 268, 274 (1978), can be too attenuated to justify exclusion, id., at 274-275. Even in the early days of the exclusionary rule, we declined to
“hold that all evidence is ‘fruit of the poisonous tree’ simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is ‘whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’” Wong Sun v. United States, 371 U. S. 471, 487-488 (1963) (quoting J. Maguire, Evidence of Guilt 221 (1959); emphasis added).
*593 Attenuation can occur, of course, when the causal connection is remote. See, e.g., Nardone v. United States, 308 U. S. 338, 341 (1939). Attenuation also occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained. “The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve.” Ceccolini, supra, at 279. Thus, in New York v. Harris, 495 U. S. 14 (1990), where an illegal warrantless arrest was made in Harris’s house, we held:
“[Suppressing [Harris’s] statement taken outside the house would not serve the purpose of the rule that made Harris’ in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated.” Id., at 20.
For this reason, cases excluding the fruits of unlawful warrantless searches, see, e. g., Boyd v. United States, 116 U. S. 616 (1886); Weeks, 232 U. S. 383; Silverthorne Lumber Co. v. United States, 251 U. S. 385 (1920); Mapp, supra, say nothing about the appropriateness of exclusion to vindicate the interests protected by the knock-and-announce requirement. Until a valid warrant has issued, citizens are entitled to shield “their persons, houses, papers, and effects,” U. S. Const., Arndt. 4, from the government’s scrutiny. Exclusion of the evidence obtained by a warrantless search vindicates that entitlement. The interests protected by the knock- and-announce requirement are quite different — and do not include the shielding of potential evidence from the government’s eyes.
*594 One of those interests is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. See, e. g., McDonald v. United States, 335 U. S. 451, 460-461 (1948) (Jackson, J., concurring). See also Sabbath, 391 U. S., at 589; Miller, 357 U. S., at 313, n. 12. Another interest is the protection of property. Breaking a house (as the old cases typically put it) absent an announcement would penalize someone who “ ‘did not know of the process, of which, if he had notice, it is to be presumed that he would obey it . . . .’” Wilson, 514 U. S., at 931-932 (quoting Semayne’s Case, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195-196 (K. B. 1603)). The knock-and-announce rule gives individuals “the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry.” Richards, 520 U. S., at 393, n. 5. See also Banks, 540 U. S., at 41. And thirdly, the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the “opportunity to prepare themselves for” the entry of the police. Richards, 520 U. S., at 393, n. 5. “The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed.” Ibid. In other words, it assures the opportunity to collect oneself before answering the door.
What the knock-and-announce rule has never protected, however, is one’s interest in preventing the government from seeing or taking evidence described in a warrant. Since the interests that were violated in this case have nothing to do with the seizure of the evidence, the exclusionary rule is inapplicable.
B
Quite apart from the requirement of unattenuated causation, the exclusionary rule has never been applied except “where its deterrence benefits outweigh its ‘substantial social costs,’ ” Scott, 524 U. S., at 363 (quoting Leon, 468 U. S., *595 at 907). The costs here are considerable. In addition to the grave adverse consequence that exclusion of relevant incriminating evidence always entails (viz., the risk of releasing dangerous criminals into society), imposing that massive remedy for a knock-and-announce violation would generate a constant flood of alleged failures to observe the rule, and claims that any asserted Richards justification for a no-knock entry, see 520 U. S., at 394, had inadequate support. Cf. United States v. Singleton, 441 F. 3d 290, 293-294 (CA4 2006). The cost of entering this lottery would be small, but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail-free card. Courts would experience as never before the reality that “[t]he exclusionary rule frequently requires extensive litigation to determine whether particular evidence must be excluded.” Scott, supra, at 366. Unlike the warrant or Miranda requirements, compliance with which is readily determined (either there was or was not a warrant; either the Miranda warning was given, or it was not), what constituted a “reasonable wait time” in a particular case, Banks, supra, at 41 (or, for that matter, how many seconds the police in fact waited), or whether there was “reasonable suspicion” of the sort that would invoke the Richards exceptions, is difficult for the trial court to determine and even more difficult for an appellate court to review.
Another consequence of the incongruent remedy Hudson proposes would be police officers’ refraining from timely entry after knocking and announcing. As we have observed, see supra, at 590, the amount of time they must wait is necessarily uncertain. If the consequences of running afoul of the rule were so massive, officers would be inclined to wait longer than the law requires — producing preventable violence against officers in some cases, and the destruction of evidence in many others. See Gates, 462 U. S., at 258 (White, J., concurring in judgment). We deemed these consequences severe enough to produce our unanimous agree *596 ment that a mere “reasonable suspicion” that knocking and announcing “under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime,” will cause the requirement to yield. Richards, supra, at 394.
Next to these “substantial social costs” we must consider the deterrence benefits, existence of which is a necessary condition for exclusion. (It is not, of course, a sufficient condition: “[I]t does not follow that the Fourth Amendment requires adoption of every proposal that might deter police misconduct.” Calandra, 414 U. S., at 350; see also Leon, supra, at 910.) To begin with, the value of deterrence depends upon the strength of the incentive to commit the forbidden act. Viewed from this perspective, deterrence of knock-and-announce violations is not worth a lot. Violation of the warrant requirement sometimes produces incriminating evidence that could not otherwise be obtained. But ignoring knock-and-announce can realistically be expected to achieve absolutely nothing except the prevention of destruction of evidence and the avoidance of life-threatening resistance by occupants of the premises — dangers which, if there is even “reasonable suspicion” of their existence, suspend the knock-and-announce requirement anyway. Massive deterrence is hardly required.
It seems to us not even true, as Hudson contends, that without suppression there will be no deterrence of knock- and-announce violations at all. Of course even if this assertion were accurate, it would not necessarily justify suppression. Assuming (as the assertion must) that civil suit is not an effective deterrent, one can think of many forms of police misconduct that are similarly “undeterred.” When, for example, a confessed suspect in the killing of a police officer, arrested (along with incriminating evidence) in a lawful warranted search, is subjected to physical abuse at the station house, would it seriously be suggested that the evidence must be excluded, since that is the only “effective deter *597 rent”? And what, other than civil suit, is the “effective deterrent” of police violation of an already-confessed suspect’s Sixth Amendment rights by denying him prompt access to counsel? Many would regard these violated rights as more significant than the right not to be intruded upon in one’s nightclothes — and yet nothing but “ineffective” civil suit is available as a deterrent. And the police incentive for those violations is arguably greater than the incentive for disregarding the knock-and-announce rule.
We cannot assume that exclusion in this context is necessary deterrence simply because we found that it was necessary deterrence in different contexts and long ago. That would be forcing the public today to pay for the sins and inadequacies of a legal regime that existed almost half a century ago. Dollree Mapp could not turn to Rev. Stat. § 1979, 42 U. S. C. § 1983, for meaningful relief; Monroe v. Pape, 365 U. S. 167 (1961), which began the slow but steady expansion of that remedy, was decided the same Term as Mapp. It would be another 17 years before the § 1983 remedy was extended to reach the deep pocket of municipalities, Monell v. New York City Dept. of Social Servs., 436 U. S. 658 (1978). Citizens whose Fourth Amendment rights were violated by federal officers could not bring suit until 10 years after Mapp, with this Court’s decision in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971).
Hudson complains that “it would be very hard to find a lawyer to take a case such as this,” Tr. of Oral Arg. 7, but 42 U. S. C. § 1988(b) answers this objection. Since some civil-rights violations would yield damages too small to justify the expense of litigation, Congress has authorized attorney’s fees for civil-rights plaintiffs. This remedy was unavailable in the heydays of our exclusionary-rule jurisprudence, because it is tied to the availability of a cause of action. For years after Mapp, “very few lawyers would even consider representation of persons who had civil rights claims against the police,” but now “much has changed. Citizens and lawyers *598 are much more willing to seek relief in the courts for police misconduct.” M. Avery, D. Rudovsky, & K. Blum, Police Misconduct: Law and Litigation, p. v (3d ed. 2005); see generally N. Aron, Liberty and Justice for All: Public Interest Law in the 1980s and Beyond (1989) (describing the growth of public-interest law). The number of public-interest law firms and lawyers who specialize in civil-rights grievances has greatly expanded.
Hudson points out that few published decisions to date announce huge awards for knock-and-announce violations. But this is an unhelpful statistic. Even if we thought that only large damages would deter police misconduct (and that police somehow are deterred by “damages” but indifferent to the prospect of large § 1988 attorney’s fees), we do not know how many claims have been settled, or indeed how many violations have occurred that produced anything more than nominal injury. It is clear, at least, that the lower courts are allowing colorable knock-and-announce suits to go forward, unimpeded by assertions of qualified immunity. See, e. g., Green v. Butler, 420 F. 3d 689, 700-701 (CA7 2005) (denying qualified immunity in a knock-and-announce civil suit); Holland ex rel. Overdorff v. Harrington, 268 F. 3d 1179, 1193-1196 (CA10 2001) (same); Mena v. Simi Valley, 226 F. 3d 1031, 1041-1042 (CA9 2000) (same); Gould v. Davis, 165 F. 3d 265, 270-271 (CA4 1998) (same). As far as we know, civil liability is an effective deterrent here, as we have assumed it is in other contexts. See, e. g., Correctional Services Corp. v. Malesko, 534 U. S. 61, 70 (2001) (“[T]he threat of litigation and liability will adequately deter federal officers for Bivens purposes no matter that they may enjoy qualified immunity” (as violators of knock-and-announce do not)); see also Nix v. Williams, 467 U. S. 431, 446 (1984).
Another development over the past half-century that deters civil-rights violations is the increasing professionalism of police forces, including a new emphasis on internal police discipline. Even as long ago as 1980 we felt it proper to *599 “assume” that unlawful police behavior would “be dealt with appropriately” by the authorities, United States v. Payner, 447 U. S. 727, 733-734, n. 5 (1980), but we now have increasing evidence that police forces across the United States take the constitutional rights of citizens seriously. There have been “wide-ranging reforms in the education, training, and supervision of police officers.” S. Walker, Taming the System: The Control of Discretion in Criminal Justice 1950-1990, p. 51 (1993). Numerous sources are now available to teach officers and their supervisors what is required of them under this Court’s cases, how to respect constitutional guarantees in various situations, and how to craft an effective regime for internal discipline. See, e. g., D. Waksman & D. Goodman, The Search and Seizure Handbook (2d ed. 2006); A. Stone & S. DeLuea, Police Administration: An Introduction (2d ed. 1994); E. Thibault, L. Lynch, & R. McBride, Proactive Police Management (4th ed. 1998). Failure to teach and enforce constitutional requirements exposes municipalities to financial liability. See Canton v. Harris, 489 U. S. 378, 388 (1989). Moreover, modera police forces are staffed with professionals; it is not credible to assert that internal discipline, which can limit successful careers, will not have a deterrent effect. There is also evidence that the increasing use of various forms of citizen review can enhance police accountability.
In sum, the social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial — incomparably greater than the factors deterring warrantless entries when Mapp was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified.
IV
A trio of cases—Segura v. United States, 468 U. S. 796 (1984); New York v. Harris, 495 U. S. 14 (1990); and United *600 States v. Ramirez, 523 U. S. 65 (1998) — confirms our conclusion that suppression is unwarranted in this case.
Like today’s case, Segura involved a concededly illegal entry. Police conducting a drug crime investigation waited for Segura outside an apartment building; when he arrived, he denied living there. The police arrested him and brought him to the apartment where they suspected illegal activity. An officer knocked. When someone inside opened the door, the police entered, taking Segura with them. They had neither a warrant nor consent to enter, and they did not announce themselves as police — an entry as illegal as can be. Officers then stayed in the apartment for 19 hours awaiting a search warrant. 468 U.S., at 800-801; id., at 818-819 (Stevens, J., dissenting). Once alerted that the search warrant had been obtained, the police — still inside, having secured the premises so that no evidence could be removed— conducted a search. Id., at 801. We refused to exclude the resulting evidence. We recognized that only the evidence gained from the particular violation could be excluded, see id., at 799, 804-805, and therefore distinguished the effects of the illegal entry from the effects of the legal search: “None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners’ apartment . . . ,” id., at 814. It was therefore “beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged.” Ibid.
If the search in Segura could be “wholly unrelated to the prior entry,” ibid., when the only entry was warrantless, it would be bizarre to treat more harshly the actions in this case, where the only entry was with a warrant. If the probable cause backing a warrant that was issued later in time could be an “independent source” for a search that proceeded after the officers illegally entered and waited, a search war *601 rant obtained before going in must have at least this much effect.[1]
In the second case, Harris, the police violated the defendant’s Fourth Amendment rights by arresting him at home without a warrant, contrary to Payton v. New York, 445 U. S. 573 (1980). Once taken to the station house, he gave an incriminating statement. See 495 U. S., at 15-16. We refused to exclude it. Like the illegal entry which led to discovery of the evidence in today’s case, the illegal arrest in Harris began a process that culminated in acquisition of the evidence sought to be excluded. While Harris’s statement was “the product of an arrest and being in custody,” it “was not the fruit of the fact that the arrest was made in the house rather than someplace else.” Id., at 20. Likewise here: While acquisition of the gun and drugs was the product of a search pursuant to warrant, it was not the fruit of the fact that the entry was not preceded by knock-and-announce.[2]
*602 United States v. Ramirez, supra, involved a claim that police entry violated the Fourth Amendment because it was effected by breaking a window. We ultimately concluded that the property destruction was, under all the circumstances, reasonable, but in the course of our discussion we unanimously said the following: “[D]estruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression.” Id., at 71. Had the breaking of the window been unreasonable, the Court said, it would have been necessary to determine whether there had been a “sufficient causal relationship between the breaking of the window and the discovery of the guns to warrant suppression of the evidence.” Id., at 72, n. 3. What clearer expression could there be of the proposition that an impermissible manner of entry does not necessarily trigger the exclusionary rule?
* * *
For the foregoing reasons we affirm the judgment of the Michigan Court of Appeals.

It is so ordered.

 Justice Breyer’s insistence that the warrant in Segura was “obtained independently without use of any information found during the illegal entry,” post, at 617 (dissenting opinion), entirely fails to distinguish it from the warrant in the present case. Similarly inapposite is his appeal to Justice Frankfurter’s statement in Wolf v. Colorado, 338 U. S. 25, 28 (1949), that the “‘knock at the door,... as a prelude to a search, without authority of law ... [is] inconsistent with the conception of human rights enshrined in [our] history,’” see post, at 620. “How much the more offensive,” Justice Breyer asserts, “when the search takes place without any knock at all,” ibid. But a no-knock entry “without authority of law” (i. e., without a search warrant) describes not this case, but Segura — where the evidence was admitted anyway.
Justice Breyer’s assertion that Segura, unlike our decision in the present ease, had no effect on deterrence, see post, at 625-626, does not comport with the views of the Segura dissent. See, e. g., 468 U. S., at 817 (Stevens, J., dissenting) (“The Court’s disposition, I fear, will provide government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home”).

 Harris undermines two key points of the dissent. First, the claim that “whether the interests underlying the knock-and-announce rule are implicated in any given ease is, in a sense, beside the point,” post, at *602 621. This is flatly refuted by Harris’s plain statement that the reason for a rule must govern the sanctions for the rule’s violation. 495 U. S., at 17, 20; see also supra, at 593. Second, the dissent’s attempt to turn Harris into a vindication of the sanctity of the home, see post, at 626-628. The whole point of the case was that a confession that police obtained by illegally removing a man from the sanctity of his home was admissible against him.