**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-1739**

———————

SONYA C. MCCASKILL,

Plaintiff - Appellee,

versus

JASON YANKALUNAS; JOHN W. MOORE; PETER L.
TYLER; JOHN FELTS,

Defendants - Appellants,

and

SALISBURY CITY POLICE DEPARTMENT; WICOMICO
COUNTY SHERIFF'S DEPARTMENT; JOHN DOE(S)
AND/OR JANE DOE(S) (Names Unknown At This
Time), Individual Officers of the Wicomico Co.
Sheriff's Dept. Task Force and of the
Salisbury City Police Dept.; CITY OF
SALISBURY, MARYLAND; STATE OF MARYLAND,

Defendants.

———————

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge.
(1:03-cv-00986-MJG)

———————

Argued: May 22, 2007                    Decided: July 27, 2007

———————

Before TRAXLER and DUNCAN, Circuit Judges, and Frank D. WHITNEY,
United States District Judge for the Western District of North
Carolina, sitting by designation.

———————

Reversed by unpublished per curiam opinion.

———————

**ARGUED:** Kevin Bock Karpinski, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellants. Alan Hilliard Legum, Annapolis, Maryland, for Appellee. **ON BRIEF:** Victoria M. Shearer, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellants.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Sonya C. McCaskill brought this action under § 1983 alleging that law enforcement officers used excessive force against her during the execution of a "no knock" search warrant in violation of the Fourth Amendment. The district court denied the officers' motion for summary judgment based on qualified immunity, and the officers appeal. We conclude that the facts, even when viewed in the light most favorable to McCaskill, fail to establish that the officers violated her constitutional rights. Accordingly, we reverse.

I.

From May 2001 until April 2002, the Wicomico County, Maryland, Narcotics Task Force received information about and conducted surveillance of George Jackson, a suspected crack dealer. Based on this investigation, Sergeant S.R. Elliot, a task force member, applied for a search warrant for illegal drugs and drug paraphernalia located at 421 Truitt Street, Salisbury, Maryland, where Jackson lived with his girlfriend, Sonya McCaskill, and her children. Elliot's application also sought authorization to search the person of Jackson and Jackson's brother Brandon, who went by the name "Loco" and sold drugs alongside Jackson. Elliot requested that the executing officers be permitted to make a "no knock" entry to prevent the destruction of evidence and to ensure officer safety

3

in light of information revealed during the investigation, including the fact that Jackson and Loco kept handguns accessible during drug transactions, had criminal histories, and had resisted arrest on at least one previous occasion. McCaskill also had a prior drug possession charge as well as an active, outstanding arrest warrant in Delaware for contempt of court. The judge granted the no-knock warrant.

At 5:30 a.m. on April 4, 2002, officers from the Task Force and the City of Salisbury Tactical Unit performed a no-knock entry at 421 Truitt Street to execute the warrant. Officer Peter Tyler testified that in executing a no-knock warrant such as this one, the standard police practice is to gain control of "[a]ll adults, even older children, . . . teenagers, [and] [a]nyone who could possibly be a threat to themselves or to us," J.A. 132, prior to conducting the search. The officers in this case did not know who was in the house before they entered.

After ramming open the front door, officers Tyler, John Felts, Jason Yankalunas and John Moore entered the living room of the residence, where Jackson happened to be sleeping on a mattress that was lying on the floor. There were no lights on in the living room. The unexpected and loud entry startled Jackson, who moved to a couch near the front door and began throwing punches at a protective shield carried by Officer Tyler. Officers Tyler and

4

Yankalunas were eventually able to subdue Jackson by pushing him down onto the sofa and placing him in flexible plastic restraints.

McCaskill, who was then five months pregnant with Jackson's child, was in the bathroom as the officers entered the home. While inside the bathroom, McCaskill heard task force members order Jackson to lie down and then Jackson say "my girl, she's pregnant." J.A. 112. As the commotion with Jackson subsided, McCaskill, wearing a t-shirt and boxers, emerged from the bathroom with her hands up and walked into the living room toward the couch where Jackson was handcuffed. Jackson "noticed [McCaskill] coming out of the bathroom" and told the officers "[m]y girlfriend is pregnant." J.A. 117. At about the same time, having seen a person moving in the apartment, one of the officers approached McCaskill from behind, ordered her to "get down" and then pushed her forward onto the mattress where Jackson had been sleeping. J.A. 57.

McCaskill landed on her stomach. The officers then placed restraints on her, completed a sweep of the apartment, determined that McCaskill's children were the only other people on the premises, and finally performed the search of the apartment, which yielded weapons and drugs. McCaskill remained on the mattress on her side during the five-minute sweep. Officer Yankalunas told McCaskill that she was being detained because of the outstanding Delaware warrant, but she was released shortly thereafter when Delaware authorities declined to pursue the charges.

5

Two days later, McCaskill was admitted to the Peninsula Regional Medical Center with a premature rupture of the uterine membrane. She delivered the fetus prematurely and it did not survive; however, no medical evidence was presented establishing that McCaskill's fall onto her stomach caused her to deliver prematurely.

McCaskill brought this action under § 1983 against the four officers who executed the warrant, alleging that they violated the Fourth Amendment by using excessive force in arresting her. Specifically, McCaskill asserts that the officers' actions were excessive because they knew she was pregnant and she was cooperative. The officers invoked qualified immunity and sought summary judgment on that basis. The district court rejected the qualified immunity defense, concluding that "no reasonable police officer would think it was proper to push, face-down, a compliant pregnant woman." J.A. 148.

II.

The doctrine of qualified immunity shields police officers performing discretionary duties "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity doctrine relieves officers of having "to

6

stand trial or face the other burdens of litigation"; thus, it is crucial for courts to "resolv[e] immunity questions at the earliest possible stage in litigation." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (internal quotation marks omitted).

In analyzing a qualified immunity claim, we must consider its requirements in the proper sequence. The first step is to determine whether the facts, viewed in the light most favorable to the plaintiff, establish that the officer violated a constitutional right. See id. at 201. If so, we then turn to the question of whether that particular constitutional right was clearly established when the violation occurred. See id.

The reasonableness standard of the Fourth Amendment applies to McCaskill's excessive force claim. We must decide if the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). "Because 'police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." Waterman v. Batton, 393 F.3d 471, 476-77 (4th Cir. 2005) (quoting Graham, 490 U.S. at 397) (internal citation omitted); see Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) ("The court's focus should be on the circumstances at the moment

7

force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection.").

Determining the reasonableness of the challenged actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). A proper assessment of "the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). In applying the reasonableness test, courts must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In sum, "the question is whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." Id. (internal quotation marks omitted).

In this case, we conclude that the force used by the officers, in the context of the tense and potentially volatile circumstances attendant to the execution of the no-knock warrant, was reasonable and clearly within the bounds of the Fourth Amendment. As reflected by the application for the search warrant, the criminal

wrongdoing at issue related to the distribution of crack cocaine -- a serious offense carrying substantial criminal penalties. See United States v. Pyles, 482 F.3d 282, 291 (4th Cir. 2007). Based on the information they possessed immediately before executing the search warrant -- that Jackson and his associate Loco used or kept handguns readily accessible and that both previously resisted arrest -- the officers had reason to believe that Jackson posed a threat to their safety. Indeed, officer safety served as one of the justifications for the no-knock entry. And, in the first few moments after the officers rammed down the door and entered the living room, Jackson's immediate reaction, which was to resist arrest momentarily by throwing punches as Officer Tyler approached, likewise suggested that Jackson was a threat to the officers.

Additionally, the time of day is an important consideration in the totality of circumstances, as is the surprise element inherent in a no-knock entry. See Hudson v. Michigan, 126 S. Ct. 2159, 2165 (2006) ("[A]n unannounced entry may provoke violence in supposed self-defense by the surprised resident."). The officers' early-morning entry of the premises startled and confused McCaskill and Jackson, who had been sleeping. The officers when they entered did not know who was on the premises, or how many people there were, or whether they were dangerous, and the events unfolded rapidly in a darkened room where Jackson had been sleeping. In this chaotic atmosphere, the officers were forced to make split-second decisions

9

regarding how to gain control of the occupants and secure the premises so that the search could be conducted.

McCaskill contends that the shove was unnecessary because she was acting in a compliant fashion, having exited the bathroom with her hands up. Even assuming McCaskill raised her hands to signal cooperation, the officer who shoved her did not act in a constitutionally unreasonable manner. McCaskill heard the officers commanding the occupants to "get down" but remained on her feet; even if she was raising her hands to show her cooperation, McCaskill was not complying with the officer's demand. Officer Tyler explained that the reason for forcing everyone onto the floor was to ensure the safety of both the officers and the occupants. And, at the time McCaskill was pushed, the officers were not finished securing the house and therefore still did not know whether there were additional occupants who might have access to handguns. We conclude that it was reasonable under the circumstances for an officer to push McCaskill down onto a mattress while securing the house after a no-knock entry, whether or not her hands were raised.

For the same reasons, we also reject McCaskill's argument that it was unreasonable for the officers to push her because she was pregnant. Her physical condition does not eliminate any of the exigent circumstances in which the no-knock warrant was executed and, under the particulars of this case, did not mandate different

10

behavior from the officers.  As appellants point out, McCaskill is essentially requesting that we require an officer to evaluate in some detail the physical condition of an occupant before securing that person for the safety of the officer and others during the search.  We do not see in this situation circumstances that would have made the pushing of McCaskill onto a mattress an excessive use of force.

Finally, although McCaskill claims that her premature delivery resulted from the fall onto the mattress, she presented no evidence establishing a causal link.  "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred."  Jackson v. Sauls, 206 F.3d 1156, 1168 (11th Cir. 2000). When a civil rights plaintiff is unable to establish real, substantial injury flowing from the conduct of the official, his constitutional claim fails.  Cf. Carter v. Morris, 164 F.3d 215, 219 n.3 (4th Cir. 1999) (concluding that claim that handcuffs were too tight, without any resulting injury, was insufficient to state a claim of excessive force).


                              III.

For the foregoing reasons, we conclude that McCaskill failed to establish a constitutional violation and that the officers are

11

entitled to summary judgment on the excessive force claim. Accordingly, we reverse the judgment of the district court.

REVERSED