*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANDREW HAKIM PARKS,

Defendant-Appellant.

UNPUBLISHED
February 18, 2021

No. 349420
Wayne Circuit Court
LC No. 18-008252-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANDREW HAKIM PARKS,

Defendant-Appellant.

No. 349426
Wayne Circuit Court
LC No. 18-008253-01-FH

Before: STEPHENS, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his convictions and sentences in two cases that were consolidated for a jury trial. In LC No. 18-008252-01-FC, the jury convicted defendant of assault with intent to commit murder, MCL 750.83, intentional discharge of a firearm from a motor vehicle causing any physical injury, MCL 750.234a(1)(b), felon in possession of a firearm, MCL 750.224f(2), carrying a dangerous weapon with unlawful intent, MCL 750.226, carrying a concealed weapon, MCL 750.227, and four counts of possession of a firearm during commission of a felony (felony-firearm), MCL 750.227b. In LC No. 18-008253-01-FH, the jury convicted defendant of felon-in-possession of a firearm, felon-in-possession of ammunition, MCL 750.224f(6), and felony-firearm. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to concurrent prison terms of 30 to 60 years for the assault with intent to commit murder conviction, 15 to 30 years for the discharge of a firearm from a vehicle conviction,

and 34 months to 10 years each for the felon-in-possession, carrying a weapon with unlawful intent, and carrying a concealed weapon convictions, which were to be served consecutive to concurrent two-year terms of imprisonment for each felony-firearm conviction. We affirm.

## I. BACKGROUND

Defendant's convictions in LC No. 18-008252-01-FC arise from the nonfatal shooting of the victim on September 14, 2018, in Detroit. Defendant and the victim had been friends since middle school. Before the shooting, defendant sent the victim a confusing text message and meme. At approximately 6:30 p.m., the victim was outside the home where he lived with his girlfriend, their newborn, and their friend MS. Defendant drove to the home in a white Chevrolet Equinox, which the victim recognized as belonging to defendant's girlfriend, Natassia Parham. The victim recognized defendant as the driver. After defendant lowered the car window, he fired a handgun multiple times at the victim, who received gunshot wounds to his leg, hip, and finger. The victim, who was bleeding, crawled to his house. The victim told MS he was "dying," and MS quickly transported the victim to the hospital. The victim was hospitalized for almost two weeks, requiring multiple surgeries for his leg and hip wounds. For three months after the victim was discharged from the hospital, he had to use a wheelchair. At the time of trial, about seven months later, the victim was still limping and walking with a cane. At trial, the victim, his girlfriend, and MS all identified defendant as the shooter.

Defendant's convictions in LC No. 18-008253-01-FC arise from a search of the home where defendant lived with Parham on September 28, 2018. The search was conducted pursuant to a search warrant. According to the police, the warrant was executed between 10:00 and 11:00 a.m. The police seized a pair of men's jeans, a handgun from the pocket of the jeans, a package of ammunition, and a cell phone. The handgun was registered to Parham, who purchased the gun on the same day as the shooting. Ballistics testing confirmed that shell casings recovered from outside the victim's home were fired from that handgun. DNA swabs from the handgun and jeans were also consistent with defendant's DNA.

Before trial, defendant moved to suppress the evidence found during the September 28 search on the ground that the police conducted the search at 8:30 a.m., before the court authorized the search warrant. Following an evidentiary hearing, the trial court credited the police officers' testimony, noting that it coincided with the search warrant return time of 11:45 a.m.

This appeal as of right followed.

## II. FOURTH AMENDMENT CLAIM

Defendant argues that the evidence seized on September 28, 2018, should have been excluded from trial because the police failed to show him the warrant when they conducted the search.

"This Court reviews for clear error findings of fact regarding a motion to suppress evidence. However, we review de novo the trial court's ultimate decision on a motion to suppress." *People v Fosnaugh*, 248 Mich App 444, 450; 639 NW2d 587 (2001). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013). "We review de novo a question of

constitutional law, including whether an individual's Fourth Amendment right to be free from unreasonable searches has been violated." *In re Consumers Energy Co*, 322 Mich App 480, 491; 913 NW2d 406 (2017); see also *People v Frohriep*, 247 Mich App 692, 696; 637 NW2d 562 (2001). Although defendant filed a motion to suppress the evidence obtained during the September 28 search, the motion was based on a different theory and defendant did not otherwise raise this issue in the trial court. Therefore, this issue is unpreserved. When a claim of error is unpreserved, our review is limited to plain error affecting defendant's substantial rights. *People v Savage*, 327 Mich App 604, 615; 935 NW2d 69 (2019).

The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. "Generally, evidence obtained in violation of the Fourth Amendment is inadmissible as substantive evidence in criminal proceedings." *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). "[W]hen information is discovered after the police violate the Fourth Amendment, the evidence should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . .' " *People v Hyde*, 285 Mich App 428, 439; 775 NW2d 833 (2009), quoting *Nix v Williams*, 467 US 431, 444; 104 S Ct 2501; 81 L Ed 2d 377 (1984). "The inevitable discovery doctrine, as applied by Michigan caselaw, permits the admission of evidence obtained in violation of the Fourth Amendment if it can be shown by a preponderance of the evidence that the items found would have ultimately been obtained in a constitutionally accepted manner." *Id*. at 439-440.

Defendant argues that his Fourth Amendment rights were violated because the police failed to show him the warrant before conducting the search. He asserts that the police were required to show him the warrant and provide him with the opportunity to produce the items described in the warrant, thereby enabling him to prevent the search and avoid further intrusion of his privacy. This interpretation of the Fourth Amendment is not supported by legal authority. In *United States v Hector*, 474 F3d 1150 (CA 9, 2007), police officers obtained a valid warrant to search the defendant's apartment "for cocaine and related paraphernalia, including currency and firearms." *Id*. at 1152. The officers knocked on the apartment door and announced their presence before they forced entry. The officers presented a "Search Warrant Notice of Service" to the defendant, but they did not show him the warrant. The defendant did not ask to see the warrant. *Id*. at 1152-1153. The officers found and seized a loaded handgun, magazine, ammunition, cocaine, and more than $4,000 in cash. *Id*. at 1153. The trial court suppressed the evidence on the ground that the officers' failure to serve the defendant with the search warrant violated the Fourth Amendment. *Id*. at 1153. The appellate court questioned the validity of this proposition in light of *United States v Grubbs*, 547 US 90; 126 S Ct 1494; 164 L Ed 2d 195 (2006). *Hector*, 474 F3d at 1154. *Grubbs* involved an anticipatory search warrant where the United States Supreme Court noted that the respondent's "argument assume[d] that the executing officer must present the property owner with a copy of the warrant before conducting his search." 547 US at 98-99. The Supreme Court rejected this argument, stating that "neither the Fourth Amendment nor [the federal rules of criminal procedure] impose[] such a requirement." But the Supreme Court also cited to *Groh v Ramirez*, 540 US 551, 562 n 5; 124 S Ct 1284; 157 L Ed 2d 1068 (2004). *Grubbs*, 547 US at 99. Review of *Groh* reveals that the Court noted that it did not address "[w]hether it would be unreasonable to refuse a request to furnish a warrant at the outset of the search, when, as in this case, an occupant of the premises is present and poses no threat to the officers' safe and effective performance of

their mission . . . ." 540 US at 562 n 5. That is hardly the case here given the police expectation that defendant retained possession of the firearm used to repeatedly shoot the victim.

In any event, even without deciding whether *Grubbs* overruled its prior precedent, the *Hector* court, citing *Hudson v Michigan*, 547 US 586; 126 S Ct 2159; 165 L Ed 2d 56 (2006), concluded that "[t]he causal connection between the failure to serve the warrant and the evidence seized is highly attenuated, indeed non-existent" because "[r]egardless of whether the police officers had actually shown Hector the search warrant, they would have executed it and recovered the drugs and firearms inside his apartment." *Hector*, 474 F3d at 1155. The Court explained:

> Assuming, as here, that a valid warrant has been obtained, the decision to present or not present the warrant bears little on the validity of the search. Indeed, the officers' failure to present the warrant to Hector was not unreasonable in light of the department policy that explicitly stated that no presentation of the warrant was required. [*Id*.][1]

Thus, the *Hector* Court's conclusion that failure to present the warrant did not affect the validity of the ensuing search also defeats defendant's argument that evidence seized during the search was the fruit of an illegal search. Defendant argues that if he had seen the warrant from the onset, as he requested, he would have had the option of providing the officers with information on the location of the gun and phone, and, thereby limited the invasion of privacy. In either event, however, the officers would have seized the gun and phone. Accordingly, defendant fails to establish any error, let alone plain error, affecting his substantial rights.[2]

Defendant also argues that defense counsel was ineffective for failing to raise this theory in the trial court. To establish ineffective assistance of counsel, defendant must demonstrate, first, that trial counsel's performance "fell below an objective standard of reasonableness," and second, that "but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011). For the reasons just discussed, defendant's Fourth Amendment theory is not legally sound. And "counsel is not ineffective for failing to raise meritless or futile objections." *People v Putman*, 309 Mich App

---

[1] MCL 780.655(1) requires an officer seizing property pursuant to a search warrant to "give to the person from whom or from whose premises the property was taken a copy of the warrant and shall give to the person a copy of the tabulation upon completion, or shall leave a copy of the warrant and tabulation at the place from which the property or thing was taken."

[2] Defendant's reliance on *Estes v State*, 35 Okla Crim 355; 250 P 809 (1926), is also misplaced. In that case, the Oklahoma Criminal Court of Appeals held that the police violated the defendant's right against unreasonable search and seizure. The officers obtained a warrant to search the defendant's property, but failed to show the warrant to the defendant's wife when she asked to see it. *Id*. at 809. The court cited the state constitution bill of rights and a state statute that required service of an alcohol-related search warrant "upon the person or persons found in possession of any intoxicating liquor." *Id*. The court did not address the Fourth Amendment. And we conclude that this prohibition-era case decided under state law is not persuasive guidance for deciding this issue.

240, 245; 870 NW2d 593 (2015). Thus, defendant cannot demonstrate that trial counsel's failure to raise this issue fell below an objective standard of reasonableness or that a different outcome would have likely resulted if trial counsel had raised the issue in the trial court.

## III. SENTENCING

Defendant argues that he is entitled to be resentenced because the trial court erred by assigning 25 points to Offense Variable (OV) 3, physical injury to a victim, when scoring the sentencing guidelines for his assault with intent to commit murder conviction. We disagree.

In reviewing a defendant's claim that the trial court assigned an improper score to an offense variable, this Court reviews "for clear error the trial court's factual determinations, which must be supported by a preponderance of the evidence." *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016). The trial court's interpretation and application of the statutory guidelines is reviewed de novo. *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004).

OV 3 considers physical injury to a victim. The court is directed to assess 25 points when "[l]ife threatening or permanent incapacitating injury occurred to a victim," and 10 points when "[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(1)(c) and (d). At sentencing, defendant argued that he should have received only 10 points for OV 3 because the victim's injuries were not life-threatening or permanently incapacitating. The trial court disagreed, stating:

> And it's not just life threatening. It is also permanently incapacitating, and he's still not walking well. He had difficulty getting up the steps and getting up to the chair to testify on the witness stand. It looks like he may never walk without a cane and with a limp.
>
> It's been quite a while now since the injury. I believe that – and being shot multiple times can be life threatening as well because of the potential for loss of blood.
>
> And he was in the hospital for 12 days with multiple surgeries. I am going – and that is also life threatening as well, any time you go under anesthesia you could lose your life. So I am going to rule that it should be 25 points rather than 10 points.

MCL 777.33 does not define "life-threatening or permanent incapacitating injury." In *People v Chaney*, 327 Mich App 586; 935 NW2d 66 (2019), this Court determined that the ordinary dictionary definition of "life-threatening" meant " 'capable of causing death : potentially fatal.' " *Id*. at 589-590, quoting *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/life-threatening (accessed October 20, 2020) [https://perma.cc/53YT-3F76]. In determining an appropriate score for OV 3, the pertinent consideration is not the defendant's actions, but "whether the victim's *injuries* were life-threatening." *Chaney*, 327 Mich App at 590. The term "incapacitate is defined in *Merriam-Webster Online Dictionary* as "1: to deprive of capacity or natural power : DISABLE [and] 2: to make legally incapable or ineligible." "Incapacitated" is similarly defined as "deprived of capacity or natural power : made incapable of or unfit for normal functioning." See https://www.merriam-webster.com/dictionary/incapacitating

(accessed October 20, 2020). Medical testimony is not required to establish that an injury is permanently incapacitating or life-threatening. *People v McCuller*, 479 Mich 672, 697 n 19; 739 NW2d 563 (2007).

We agree that the record does not support a finding that the victim's injuries were life-threatening. In *Chaney*, this Court set forth principles for distinguishing life-threatening injuries from serious injuries that are not potentially fatal. 327 Mich App at 586. The victim in *Chaney* suffered scalding burns that became third-degree, full-thickness burns requiring multiple debridement surgeries and skin grafts. *Id*. at 588. The trial court found that these injuries were life-threatening. *Id*. 589. This Court disagreed because the medical records did not indicate that the injuries were potentially fatal. This Court stated:

> While DM suffered a serious injury requiring a lengthy hospitalization, no heroic measures were needed, and there is no suggestion in the records that DM's life was ever in danger. Her burn wounds required multiple procedures, but the medical records show that there were no complications and that she was in stable condition throughout her hospital stay. If the fact that the DM's injuries required significant and ongoing medical treatment by itself established a life-threatening injury, MCL 777.33(1)(d) (10 points for bodily injury requiring medical treatment) would be rendered nugatory. See *People v Pinkney*, 501 Mich 259, 282; 912 NW2d 535 (2018). Instead, we must give effect to the ordinary meaning of "life-threatening" by requiring some evidence indicating that the injuries were, in normal course, potentially fatal. In the absence of evidence suggesting that DM's life was placed at risk or more general evidence establishing that the injury suffered was by nature life-threatening, the trial court's finding was clearly erroneous, i.e., not supported by a preponderance of the evidence. See *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). [*Chaney*, 327 Mich App at 590-591 (footnotes omitted).]

In *People v Rosa*, 322 Mich App 726, 746-747; 913 NW2d 392 (2018), this Court held that the victim's strangulation was life-threatening because she sustained "petechiae around her eyes, a phenomenon that results from an extended period of strangulation and is the result of increasing venous pressure in the head and anoxic injury to the vessels." External and internal bruising of her throat demonstrated "an extended period during which her airway was shut down, depriving her brain of oxygen." *Id*. at 747. This Court commented that an act of strangulation would not always be sufficient to support a 25-point score for OV 3. *Id*.

In this case, although the victim required multiple surgeries and a lengthy hospitalization, there is no evidence that his life was in danger from his wounds, and the severity of his injuries are not comparable to the injuries this Court has deemed sufficient to meet the "life-threatening" threshold. The gunshot wounds caused serious injury to the victim's legs and impaired his mobility, but there is no evidence suggesting that these injuries were nearly fatal as required by *Chaney*, 327 Mich App 586. The trial court remarked that gunshot wounds always bring the risk of excessive bleeding. However, third-degree burns and strangulation are also injuries with a substantial risk for fatal outcomes, yet this Court in *Chaney* and in *Rosa* focused on whether the victims' actual injuries were potentially fatal. *Chaney*, 327 Mich App at 590-591; *Rosa*, 322 Mich App at 746-747. The pertinent inquiry is not whether defendant's actions were life-threatening, but whether the victim's resulting injuries were life-threatening. *Chaney*, 327 Mich App at 590.

Accordingly, a potential risk that a gunshot wound could be life-threatening is not sufficient by itself to support a 25-point score for OV 3. Likewise, the trial court's comment about the risks of anesthesia do not support the 25-point score because there was no evidence that the victim's life was endangered by anesthesia.

However, a 25-point score for OV 3 also appropriate if a victim suffers a permanent incapacitating injury. The evidence at trial indicated that the victim's injuries affected his ability to walk. A CT scan from the victim's medical records reveals that, four days post-shooting, his leg lengths measured 83.7 centimeters as to his right lower extremity, but 84.8 centimeters as to his left lower extremity. And, after being discharged from the hospital, the victim was confined to a wheelchair for three months. At sentencing, the trial court observed that during trial, more than seven months after the shooting, the victim walked slowly with a cane, limped, and had difficulty navigating the steps to the witness stand. Defendant argues that an injury should be deemed permanently incapacitating only if it impedes a victim's ability to work or live independently. The statutory language of MCL 777.33, however, imposes no such conditions. As indicated earlier, the ordinary meaning of incapacitate is to deprive of capacity or natural power. The victim's continued impaired mobility more than seven months after the shooting, for which he required the use of a cane, was sufficient to demonstrate that his injuries deprived him of the capacity or power to walk naturally. Accordingly, the trial court did not err by assessing 25 points for OV 3.

## IV. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises several claims of ineffective assistance of counsel in a pro se brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4. Because defendant failed to raise these claims in an appropriate motion or request for a *Ginther*[3] hearing in the trial court, our review is limited to mistakes apparent from the record.[4] *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

Defendant lists several alleged errors by his trial counsel.[5] These include (1) failing to provide defendant with certain discovery materials until days before trial; (2) failing to call Officer

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] For reasons that we will discuss, we decline defendant's request to remand this case for a *Ginther* hearing on his ineffective-assistance claims.

[5] To the extent that defendant repeats the appellate counsel's arguments, we reject them for the reasons already discussed.

Royer Hernandez[6] to testify in support of defendant's motion to suppress evidence;[7] (3) failing to request video from Sergeant Jason Burke's body camera;[8] (4) failing to show that it was Parham's cell phone, not defendant's cell phone, in the area of the shooting;[9] (5) failing to address the prosecutor's misconduct of presenting perjured testimony by the officers; (6) failing to investigate and present an alibi defense;[10] (7) failing to poll the jury; and (8) failing to address the lack of a signature and date on the verdict form.

Defendant bears "the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Moreover, a defendant on appeal bears the burden of "furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000).

Counsel's decision regarding the defense to be pursued is a matter of trial strategy. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995) (determining that a counsel "faced with a choice between two defenses with significant evidentiary problems" may elect to pursue one over the other); *People v Strong*, 143 Mich App 442, 449; 372 NW2d 335 (1985). And a reviewing "court cannot conclude that merely because a trial strategy backfires, effective assistance of counsel is denied." *Strong*, 143 Mich App at 449. "Likewise, decisions regarding what evidence

---

[6] Defendant refers to the officer as Royer Hernandez or Royer. The prosecution's final witness list includes Officer Royer Hernandez. During trial, defendant's trial counsel waived Hernandez's production as it would be cumulative to the trial testimony of Hernandez's partner.

[7] According to defendant, Hernandez indicated that defendant's arrest occurred at 10 a.m. At the hearing on his motion to suppress, defendant testified that the police entered his girlfriend's home at 8:30 a.m. and removed him by 10 a.m. or, at the latest, 10:30 a.m.

On the other hand, the prosecution presented evidence that (1) the search warrant was authorized at approximately 9 a.m., (2) an officer photographed the authorized warrant at approximately 10:05 a.m., (3) dispatch records reflected that the police were inside the residence and had secured it at 10:43 a.m., and (4) the return indicated a time of 11:45 a.m. Moreover, discussion during trial reflected that defendant's girlfriend's interview began at 10:45 a.m., not 10:15 a.m. as defendant alleged, and ended at 11:28 a.m.

[8] According to defendant, Burke's video would have contradicted the officers' testimony regarding the bedroom in which the gun was found. Sergeant Burke was named, but not listed as a witness who would be called at trial, on the prosecution's final witness list. Even so, at trial, other officers described his role in executing the search warrant.

[9] At trial, law enforcement officers testified that a cell phone, later determined to be in contact with the cellular tower and sector consistent with the shooting location, was linked to both defendant and his girlfriend, and was not in defendant's name. Police investigation determined that there was no subscriber information on the actual registered person.

[10] Defendant contends he and his girlfriend were at his home near the crime scene at the time of the shooting along with a cell phone that belonged to him.

to present, what evidence to highlight during closing argument, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *Putman*, 309 Mich App at 248.

Defendant complains that trial counsel did not provide him with certain discovery materials until days before trial. However, defendant has not factually supported this claim or explained how he was prejudiced by the late production of these materials. Thus, this ineffective-assistance claim cannot succeed.

Regarding the failure to call witnesses, to present evidence, or to present an alibi defense, defendant has not established that trial counsel's performance fell below an objective standard of reasonableness or that counsel's alleged omissions had a reasonable probability of affecting the outcome. *Armstrong*, 490 Mich at 289-290. Indeed, the evidence against defendant was particularly strong as numerous witnesses, including two long-time acquaintances of defendant, identified him as the shooter inside his girlfriend's vehicle. Shortly before the shooting, defendant sent the victim an unusual text and failed to respond when the victim inquired as to its meaning. Defendant's girlfriend purchased the firearm on the day of the shooting.[11] A fully loaded 9-millimeter Luger SCCY, that was later determined to have fired all six bullet casings retrieved from the shooting scene, was found in men's jeans in a bedroom in defendant's girlfriend's house along with additional ammunition. And a DNA expert testified that her findings regarding the mixed-sample DNA located on the weapon were "very strong support" that defendant was a contributor.

Defendant further argues that trial counsel failed to address the prosecutor's misconduct of introducing perjured testimony. A defendant alleging perjury bears the burden of proving the testimony was actually false. *People v Bass*, 317 Mich App 241, 272-273; 893 NW2d 140 (2016). As he did below, defendant contends that the police lied about entering his girlfriend's home only after the search warrant was authorized. At sentencing, defendant orally raised this same claim to argue for a new trial. The trial judge denied defendant's request, stating that she found the officers' testimony credible. In light of the corroborating evidence presented during the police officers' testimony at the hearing on defendant's motion to suppress and the on-the-record discussion devoted to defendant's allegations during trial and sentencing, we conclude that defendant has not met his burden of proving that the testimony was actually false. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998) (the mere fact that a witness's testimony conflict with earlier statements or the testimony of other witnesses does not establish that a prosecutor knowingly presented perjured testimony). Additionally, the record reflects that trial counsel was aware of defendant's view of the circumstances surrounding the execution of the search warrant and litigated a motion to suppress the evidence seized. Therefore, defendant's ineffective assistance of counsel claim in this regard also fails.

Defendant further fails to explain how he was prejudiced by trial counsel's failure to request that the jury be polled. Polling of the jury is not mandatory. The trial court "on its own initiative may, or on the motion of a party must, have each juror polled in open court as to whether the verdict announced is that juror's verdict." MCR 6.420(D). The trial court instructed the jury that "[a] verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary

---

[11] As a convicted felon, defendant could not legally purchase a firearm.

that each of you agrees on that verdict." Juries are presumed to have followed their instructions. *People v Bruner*, 501 Mich 220, 228; 912 NW2d 514 (2018). Defendant does not identify any evidence suggesting that the jury did not follow its instructions or that its verdicts were not unanimous. Absent any such evidence, there is no basis for concluding that the jury's verdicts were not unanimous. Thus, there can be no basis for concluding that there is a reasonable probability of a different result if defense counsel had requested that the jury be polled. Therefore, this ineffective-assistance claim cannot succeed.

Similarly, there is no merit to defendant's claim that trial counsel was ineffective for failing to object to the verdict form on the basis that it was not signed or dated. Preliminarily, defendant does not identify any legal requirement that a verdict form is required to be signed or dated. Indeed, the examples of different verdict forms in Michigan's Model Criminal Jury Instructions do not contain any signature or date requirement. See M Crim JI 3.24 – M Crim JI 3.33. In any event, contrary to what defendant asserts, the record discloses that the verdict form in this case is dated May 2, 2019. And, although no signature appears on the electronic version of the verdict form,[12] the verdicts specified thereon were recited on the record in court and the jury foreperson confirmed that they were the jury's true verdicts. Thus, there is no basis for concluding that the written verdict form did not reflect the verdicts of defendant's jury.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Anica Letica

---

[12] It is unclear whether this information was redacted from the actual jury verdict form.

-10-