[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14338
_____

D.C. Docket No. 1:14-cv-20840-BB


HECTOR SANTANA,
as Personal Representative of the Estate of Michael Santana,

Plaintiff - Appellant,


versus


MIAMI-DADE COUNTY,
GERMAN ALECH,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 17, 2017)

Before WILSON and JULIE CARNES, Circuit Judges, and WOOD,[*] Judge.

PER CURIAM:

Plaintiff appeals the district court's order granting summary judgment to Defendants on his 42 U.S.C. § 1983 unlawful entry and excessive force claims asserted against Miami-Dade County police officer German Alech in his individual capacity and on his state negligence and wrongful death claims asserted against the County. All of these claims arise from the shooting of Plaintiff's son, Michael Santana, by Officer Alech while Alech and other Miami-Dade police officers were executing a search warrant at Santana's residence on March 7, 2012. We agree with the district court that Officer Alech is entitled to qualified immunity on Plaintiff's § 1983 claims and that there is no basis for Plaintiff to recover against the County on his negligence or wrongful death claims. Accordingly, we **AFFIRM** the district court's summary judgment order.

## BACKGROUND

At the end of February 2012, a confidential informant told Miami-Dade detective Louis Correa that marijuana was being sold at a Miami Lakes, Florida residence where Plaintiff's son, Michael Santana, lived at the time. Detective Correa surveilled the residence and saw evidence of drug activity, including multiple cars stopping by for brief periods of time and then leaving. Correa

---

[*]Honorable Lisa Wood, Chief United States District Judge for the Southern District of Georgia, sitting by designation.

2

arranged for the confidential informant to make a controlled purchase on February 29, 2012, during which the informant bought ten grams of marijuana from a male subject inside the residence.

On March 1, 2012, the day after the controlled purchase, Correa requested that the Miami-Dade Special Response Team ("SRT") assist in executing a search warrant at the residence that was scheduled to occur on March 7, 2012.[1]  Correa initiated his request for SRT assistance by submitting a computer-generated search warrant information sheet.  After reviewing the information sheet, SRT commander Lieutenant Calvin James approved Correa's request for assistance, and assigned execution of the warrant to SRT team leaders Sergeant Luis Sierra and Sergeant Mauricio Smith.  The information sheet contained a subject line to address "weapons, dogs, children" or other concerns with executing the warrant at the residence.  That space was marked "UNKNOWN" by Correa.

On March 5, 2012, Correa arranged for the confidential informant to make a second controlled purchase, during which the informant bought ten more grams of marijuana from the same male subject inside the residence.  Correa testified that the informant advised him after the second purchase that the subject carried a gun on his person.

---

[1]  The SRT is an elite tactical unit utilized for executing high risk search warrants, among other operations.  The SRT is frequently called to assist in the execution of drug warrants due to the propensity for drug dealers to be armed and violent.

3

On March 6, 2012, the day after the second purchase, Correa prepared a supplemental confidential informant report. The supplemental report described the second purchase, including the procedures used to make the purchase and the amount of marijuana involved, but it did not include any information about the subject being armed.

On March 7, 2012, Correa appeared before state court judge Migna Sanchez-Llorens to obtain a search warrant for the residence. In an affidavit submitted in support of issuing the warrant, Correa stated that he had received information from a confidential informant that drugs were being sold at the residence. Correa described his surveillance of the residence and the two controlled purchases made there, but he did not include any information in the affidavit about the subject being armed. Judge Sanchez-Llorens signed the warrant. The warrant did not indicate that the subject was armed, but it did contain boilerplate language referring to the potential presence of "firearms, magazines, projectiles, spent casings, ammunition, holsters, and/or any other firearm paraphernalia."

On the evening of March 7, 2012, after the warrant was signed, Correa conducted a drive-by of the residence with Sergeants Smith and Sierra. Smith testified that Correa told him during the drive-by that the subject inside the residence was known to carry a gun on his person.

4

After the drive-by, the SRT officers who were to be involved in executing the warrant, including Officer Alech, met at a staging area for a pre-execution briefing conducted by Smith and Correa.  Smith testified that Correa advised all of the officers during the briefing that the subject inside the residence was known to carry a gun.  Alech as well as Officer Garcia, another member of the SRT team, confirmed that they were told during the pre-execution briefing that the subject was armed.  And Plaintiff concedes that, in fact, Santana always made it a point to carry a loaded gun.

During the pre-execution briefing, the officers were given their assignments for executing the warrant.  Alech was assigned to be the shield operator, whose job is to enter the residence first and then provide cover for the rest of the team as they conduct the search.

Alech and the other officers traveled to the residence immediately after the briefing and arrived there at approximately 8:20 p.m.  Alech was wearing his police-department-issued uniform, which contained police insignia and logos on the chest and right and left shoulder area.  In addition, Alech wore a ballistic helmet and carried a black bulletproof shield with the word "POLICE" written on it in white block lettering.

The parties dispute whether the officers knocked or announced their presence before they entered the residence.  Sergeant Smith and Officer Garcia

5

testified that they and other officers yelled the words "police" and "search warrant" as they approached the front door.  However, Santana's girlfriend, Brittany Retkofsky, who was inside the residence when the officers approached, testified that she did not hear any announcement.  Santana's neighbor, Rolando Valdes, similarly testified that he saw the officers approach Santana's residence but did not hear an announcement.  In addition, surveillance video recordings that captured the approach suggest that the officers did not knock on the door before they entered the residence.  Thus, for purposes of this appeal, we assume the officers did not announce their presence or knock prior to entering the residence.

When they reached the front door to the residence, the officers discovered it was locked.  They set a pry tool in the doorframe and forcibly opened the door.  Per the tactical plan, Alech was the first officer to enter the residence after the door was forced open.  Upon entry, Alech encountered a running wall directly in front of him and he turned left and proceeded down a hallway created by the wall and the front entrance.  Officer Garcia turned left and followed Alech down the hallway.  The other officers turned right and moved down the hallway in the opposite direction.

Santana and Retkofsky were in the residence when the officers entered.  As Alech walked down the hallway, he saw Santana run by with a gun in his hand.  Alech momentarily lost sight of Santana as Santana passed by Alech and took

6

cover behind a nearby wall.  When Alech regained sight of Santana, Santana had assumed a crouched position that Officer Garcia, who was directly behind Alech at the time, described as "threatening."  Santana was holding the gun in his hand and pointing it in Alech's direction.

As the officers entered the residence, they shouted "Get down on your knees, get down."  Retkofsky complied, but Santana did not.  When Alech encountered Santana, he directed Santana to drop the gun.  Again, Santana did not immediately comply with this command.  Alech testified that Santana never dropped the gun, causing Alech to fear for his life and ultimately to shoot Santana. Retkofsky confirmed that Santana never voluntarily got on his knees,[2] as directed by the officers, and that he did not comply with the first command to drop the gun. However, Retkofsky testified that when Alech gave a second command to drop the gun, Santana said "Okay, okay, okay" and his "hands went up."  According to Retkofsky, she saw the gun "slide" or "fall" as Santana's hands went up, and then she saw Santana, having been shot, "hit the floor."

Retkofsky initially indicated that she did not know if Santana was still holding the gun at the time of the shooting.  She later stated that Santana did not have the gun in his hands when he was shot.  Construing the facts in favor of Plaintiff, and assuming that Santana was no longer holding the gun at the precise

---

[2] Retkofsky indicated in her testimony that Santana went down to his knees after he was shot, but that the only part of his body that moved before the shots were fired was his hands.

moment he was shot, it is evident from Retkofsky's testimony that the shooting occurred within a split second of the gun "falling" or "sliding" out of Santana's hands. Indeed, the parties agree that the entire encounter—from when the officers entered the residence until Santana was shot—only lasted five to ten seconds. Defendants asserted in their statement of undisputed material facts that the encounter between Alech and Santana "occurred within a matter of seconds." In support of that assertion, Defendants cited the testimony of Sergeant Smith, who stated that the first gunshot was fired within five to ten seconds of Alech's entry into the house. Plaintiff admitted this fact, which is not controverted by any evidence in the record. In addition, Plaintiff affirmatively asserted in his own statement of facts that the shooting occurred "less than six seconds from the moment" the police entered the house.

Alech fired three shots at Santana, killing him on the scene. After the shooting, Alech continued his search of the residence. During the search, Alech recovered an additional handgun and an AR-15 submachine gun from Santana's bedroom.

Plaintiff filed this suit as personal representative of Santana's estate. In his amended complaint, Plaintiff asserted § 1983 illegal entry and excessive force claims against Alech in his individual capacity and state negligence and wrongful death claims against the County. Defendants filed a motion for summary judgment

8

on all of Plaintiff's claims, which the district court granted.  The court found that Alech was entitled to qualified immunity on the § 1983 claims because it was undisputed that (1) Alech had information suggesting that the subject inside the residence was an armed drug dealer, justifying a no-knock entry and (2) just prior to the shooting, Santana had ignored commands to get down on his knees and drop the gun he was holding and had pointed the gun in Alech's direction, justifying Alech's use of deadly force.[3]    The court concluded that these undisputed facts likewise precluded Plaintiff's state claims against the County.

## ANALYSIS

### I.    Standard of Review

We review a district court's order granting summary judgment de novo. *Broadcast Music*, *Inc. v. Evie's Tavern Ellenton*, *Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014).  In conducting our review, we construe the evidence and draw all inferences in favor of Plaintiff.  *Id.*  "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).  "A mere 'scintilla' of evidence" is insufficient to withstand summary judgment.  *Walker v.*

---

[3]  The court held in the alternative that Plaintiff lacked standing to assert an unlawful entry claim because Santana was a "trespasser" in the residence at the time of the incident.  Because we resolve the case on qualified immunity grounds, we need not—and do not—determine whether Santana was a trespasser for purposes of the unlawful entry analysis or otherwise address the standing issue.

*Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  Rather, "there must be enough of a showing that the jury could reasonably find" for Plaintiff.  *Id.*

Specifically with regard to qualified immunity, we acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case."  *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (internal quotation marks omitted).  Nevertheless, we view the facts from Plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove, but, rather, whether or not certain given facts" demonstrate a violation of clearly established law.  *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).  *See also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (noting "the importance of drawing inferences in favor of the nonmovant" in the qualified immunity context).

## II.    Plaintiff's § 1983 Claims

### A.    Unlawful Entry

The district court held that Alech was entitled to qualified immunity on Plaintiff's § 1983 unlawful entry claim.  "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

10

Acting under the direction of the commanding sergeant of his team, Alech was assisting in the execution of a search warrant, and thus engaged in a discretionary duty, when he entered Santana's residence. Accordingly, it is Plaintiff's burden to show that Alech is not entitled to qualified immunity. *See id.* at 995. To meet this burden with respect to his unlawful entry claim, Plaintiff must demonstrate that Alech's entry into Santana's residence violated a clearly established constitutional right. *See McCullough*, 559 F.3d at 1205. We agree with the district court that he cannot do so.

The Fourth Amendment, which protects against unreasonable searches and seizures, ordinarily requires that an officer knock and announce his purpose before forcibly entering a home to execute a search warrant. *See Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). The requirement does not apply, however, where the officer executing the warrant has "a reasonable suspicion that knocking and announcing [his] presence . . . would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). In the qualified immunity context, the relevant inquiry is whether the officer had "arguable reasonable suspicion" that a sufficient exigency existed to justify a no-knock entry. *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009) (internal quotation marks omitted). "In other words, we analyze whether a reasonable officer could

11

have had reasonable suspicion that exigent circumstances, such as a threat of violence and/or destruction of evidence, existed to justify the no-knock entry." *Id.* The required showing is "not high." *Richards*, 520 U.S. at 394. *See also Hudson v. Michigan*, 547 U.S. 586, 590 (2006) ("We require only that police have a reasonable suspicion . . . under the particular circumstances that one of these grounds for failing to knock and announce exists, and we have acknowledged that [the] showing is not high.") (internal quotation marks omitted); *United States v. Segura-Baltazar*, 448 F.3d 1281, 1290 (11th Cir. 2006) (noting the Supreme Court's "observation that the officer's burden 'is not high'" to justify a no-knock entry).

Undisputed evidence in the record shows that Alech had been told by the investigating officer that the subject inside the residence to be searched on March 7, 2012 was a drug dealer with ready access to a gun, meaning that Alech thereby had reason to believe the subject was armed: an exigency that we have held justifies a no-knock entry. *See Whittier*, 581 F.3d at 1309 (granting qualified immunity on an unlawful entry claim where the officer did not knock before serving a search warrant on the home of a suspected drug dealer who had "ready access to firearms"); *see also United States v. Hromada*, 49 F.3d 685, 689 (11th Cir. 1995) (recognizing that "[g]uns and violence go hand-in-hand with illegal drug operations"). To recap, Detective Correa learned from a confidential

informant, and validated by conducting surveillance and arranging two successful controlled purchases, that drugs were being sold out of Santana's residence. Correa testified that the confidential informant advised him, after the second controlled purchase, that the subject inside the residence carried a gun on his person. Correa testified, as did Sergeant Smith, and Officer Garcia, that this information was shared with the SRT officers, including Alech, during a briefing held immediately prior to execution of the warrant on March 7, 2012. Alech likewise confirmed that he had been informed that the subject carried a gun on his person. There is simply no evidence to refute the testimony of the officers on this issue. Indeed, corroborating all of the above information, Plaintiff concedes that Santana was dealing drugs and that he did in fact always make it a point to have a loaded gun within arm's reach.

Nevertheless, Plaintiff argues there is a question of fact as to whether Alech actually received information suggesting that the subject inside the residence was armed. In support of his argument, Plaintiff points to three documents: (1) the search warrant information sheet submitted by Correa on March 1, 2012 to request SRT assistance with the search, (2) the supplemental confidential informant report prepared by Correa on March 6, 2012, and (3) the search warrant affidavit prepared by Correa and presented to Judge Sanchez-Llorens on March 7, 2012. Contrary to Plaintiff's argument, none of these documents raises an issue of fact as to whether

13

Alech received information suggesting—and thus giving him reasonable ground to believe—the subject was armed.

As discussed above, the search warrant information sheet submitted by Correa to the SRT team on March 1, 2012 contained a subject line to address "weapons, dogs, children" or other concerns with executing the warrant at the Property. This space was marked "UNKNOWN" by Correa. Plaintiff argues a jury could reasonably infer from the "UNKNOWN" response that Correa lacked any information to suggest there was a weapon in the residence. However, the search warrant information sheet was generated by Correa on March 1, 2012. Based on all the relevant evidence, Correa did not learn the subject was armed until after the second controlled purchase was conducted on March 5, 2012. Thus, the only inference that can be drawn from the search warrant information sheet is that Correa did not know, as of March 1, 2012, whether any weapons were in the residence, which says nothing about what Alech had been told prior to entering the residence on March 7, 2012.

Correa testified that he did not have access to the search warrant information sheet after he submitted it, and thus could not amend the sheet once he learned that the subject was armed. For that reason, according to Correa, he typically provided any new information—such as the weapons information provided by the confidential informant after the second controlled purchase on March 5, 2012—

14

directly to the officers who would be involved in executing the warrant. Again, Correa's testimony on this point is unrebutted.

As to the supplemental confidential informant report Correa prepared on March 6, 2012 and the search warrant affidavit he executed on March 7, 2012, both documents were created after Correa was advised that the subject was armed. However, neither the supplemental report nor the search warrant affidavit specifically seeks information about weapons. Nor does Plaintiff present any evidence suggesting that weapons information should be expected to appear in either of those documents. Correa testified, again unrebutted, that information related to a suspect being armed would not ordinarily be included in either document, both of which dealt with an ongoing narcotics investigation rather than a weapons crime.

Finally, Plaintiff contends that Alech's claim to have been aware that the subject was armed prior to entry is undermined by a report prepared by Sergeant Smith the day after the incident stating that the officers knocked and announced their presence prior to entering the residence. According to Plaintiff, Smith's statement gives rise to the reasonable inference that the officers believed a proper entry required compliance with the knock-and-announce rule. But as we explained in *Whittier*, the fact that an officer claims to have knocked and announced prior to entry—or believed he was required to knock and announce—does not alter the

analysis. *See Whittier*, 581 F.3d at 1309–10 (noting that the officer's "*subjective* beliefs regarding the circumstances are irrelevant to the qualified immunity inquiry") (emphasis in original). Assuming there were objectively reasonable grounds to believe the subject in the residence was an armed and dangerous drug dealer, a no-knock entry was justified. *See id.* Undisputed testimony establishes that Alech had objectively reasonable grounds for such a belief and, consequently, that Alech is entitled to qualified immunity on Plaintiff's illegal entry claim.

## B.    Excessive Force

The district court held that Alech also was entitled to qualified immunity on Plaintiff's excessive force claim arising out of Santana's shooting. Again, it is undisputed that Alech was engaged in a discretionary duty when he shot Santana. It is thus Plaintiff's burden to show that qualified immunity is not appropriate by demonstrating (1) the violation of a constitutional right (2) that was clearly established at the time of the incident. *See McCullough*, 559 F.3d at 1205. Viewing the evidence in the light most favorable to Plaintiff, neither prong is satisfied in this case.

### 1.    Constitutional Violation

Plaintiff's excessive force claim is analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989) and

16

*Tennessee v. Garner*, 471 U.S. 1 (1985)).  Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used.  *See id.*  We view the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted).  And we allow for the fact that officers are often required to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* (internal quotation marks omitted).

It is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a subject who poses an imminent threat of serious physical harm to the officer or others.  *See Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril.") (internal quotation marks omitted); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand.") (internal quotation marks omitted).  The relevant inquiry in the qualified immunity context is whether an officer in the defendant's position reasonably could have perceived the subject to pose such a threat.  *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234,

1246 (11th Cir. 2003) (finding no constitutional violation where the defendant officer shot a suspect he "could reasonably [have] perceive[d]" to pose "an imminent threat of violence to the officer and other bystanders").  The officer is entitled to qualified immunity unless "every reasonable officer" in his position "inevitably" would conclude that deadly force was unnecessary and thus unlawful under the circumstances.  *See Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).

The record evidence unequivocally supports Alech's claim that an objectively reasonable officer could have perceived Santana to pose an imminent and serious threat at the time of the shooting.  Alech was advised in the pre-execution briefing that the subject inside the residence to be searched was a suspected drug dealer who was known to be armed with a gun.  The accuracy of that information was confirmed immediately after Alech entered the residence and encountered Santana running through the residence with a gun in his hand.  Dressed in his police uniform and carrying a black shield with the word "POLICE" written on it in white block lettering, Alech ordered Santana to drop the gun, and either Alech or another officer instructed Santana to "Get down on your knees, get down."  Santana refused to comply with these commands, instead running past Alech, causing Alech to momentarily lose sight of Santana.  When Alech regained sight of Santana, Santana was crouched against a wall—in a position that Officer

18

Garcia described as "threatening"—still holding the gun and pointing it in Alech's direction. Alech testified that Santana never dropped the gun, and fearing for his life, Alech shot Santana.

Citing Retkofsky's deposition testimony, Plaintiff argues that there is a question of fact as to whether Santana had surrendered—and thus no longer posed a serious threat—at the time he was shot. Having carefully reviewed Retkofsky's testimony, we do not believe it supports an inference that "every reasonable officer" would have understood that Santana no longer posed an imminent threat when he was shot, as required to overcome qualified immunity. *See Post*, 7 F.3d at 1559. Indeed, Retkofsky's testimony corroborates Alech's account of the most critical events leading up to the shooting. Retkofsky acknowledged that Santana had a gun in his hands when the officers entered the residence. Retkofsky testified that she heard the officers saying "get down on your knees" and that she complied with this command the first time it was given, but Santana did not. Retkofsky stated that the officers repeated the command to "get down" and also ordered Santana to put the gun down, but Santana still did not comply. Instead, according to Retkofsky, Santana remained standing against a wall, holding the gun in both of his hands and pointing it in the direction of the officers.

Only at this point does Retkofsky's testimony diverge from Alech's testimony, with Retkofsky claiming that after the officers gave an additional

19

command to drop the gun, Santana said "Okay, okay, okay" and his "hands went up." According to Retkofsky, the gun then "slid" or "fell" from Santana's hands and Santana "hit the floor," having been shot. As mentioned above, Retkofsky testified inconsistently as to whether Santana was still holding the gun when he was shot. Nevertheless, even drawing the most positive inference from Retkofsky's testimony—that the gun "slid" or "fell" from Santana's hands at the same time, or possibly after, Santana's hands "went up" (that is, Santana was not still holding the gun at the precise moment when he was shot), the shooting necessarily occurred within a split second of the gun leaving Santana's hands.

Retkofsky's testimony suggests that Santana might have intended to begin the process of surrendering immediately prior to being shot. But we cannot infer from her testimony that every reasonable officer would have intuited from Santana's ambiguous act—occurring at most just a split second before Alech fired—that Santana no longer posed a serious threat at the time of the shooting. Based on Retkofsky's testimony, Santana had ignored at least one command to drop the gun he was holding, and he never voluntarily got down on his knees before the shots were fired. After he was instructed a second time to drop the gun, Retkofsky says Santana said "Okay, okay, okay" and moved his hands "up." But to the extent that he even had time to process this action before firing, Alech could reasonably have interpreted the statement and movement as an escalating threat

20

rather than as an attempt to surrender, particularly given that the gun had not "slid" or "[fallen]" from Santana's hands until the same time as, or possibly even after, his hands began moving up. *See McCormick*, 333 F.3d at 1246 (granting qualified immunity on an excessive force claim where the plaintiff claimed to have raised his hands in "submission" just prior to being shot, but acknowledged that he was still holding a stick in his hands when he raised them, such that the defendant officer "could reasonably [have] perceive[d]" that the plaintiff "posed an imminent threat of violence to the officer and other bystanders"); *cf. Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (concluding that an officer used excessive force when she shot a suspect who had formerly resisted, but who was retreating, unarmed, and outside of striking distance at the time of the shooting) and *Perez v. Suszczynski*, 809 F.3d 1213, 1219 (11th Cir. 2016) (holding that an officer used excessive force when he shot a subject who had been disarmed and who was "subdued, compliant, and on the ground . . . on his stomach with his arms restrained" at the time of the shooting).

Finally, we cannot over-emphasize that the parties agree, and that both parties affirmatively assert, that the entire encounter—from when Alech entered the residence until Santana was shot—lasted only five to ten seconds. During that short period of time, it is undisputed that Santana, a suspected drug dealer, ran through the residence with a gun in his hand, ignored multiple commands to get on

21

his knees and at least one command to drop the gun he was holding, and assumed a crouching position that Officer Garcia described as "threatening" while pointing the gun in Alech's direction. Crediting Retkofsky's testimony and assuming that Santana said "okay" and began to move his hands up after he was directed a second time to drop the gun, Alech was forced in that moment to make a split-second decision whether to employ deadly force in the "tense and dangerous situation" that confronted him. To defeat qualified immunity, Plaintiff would have to persuade us that "every reasonable officer" would have concluded that deadly force was unnecessary and thus unlawful under the circumstances. We are not persuaded. *See Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (noting that we are "loath to second-guess" an officer's "split-second" decision that is necessitated by a "tense, uncertain, and rapidly evolving" situation in the field); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166–70 (11th Cir. 2009) (concluding that the defendant officers reasonably reacted with deadly force to the imminent threat posed by a suicidal man who was ignoring their commands to drop the gun he was holding and to show his hands).

### 2.    Clearly Established Law

Even assuming a constitutional violation, Alech is entitled to qualified immunity unless Plaintiff can show that Santana's right not to be subjected to deadly force under the particular circumstances surrounding his shooting was

22

"clearly established" at the time of the incident. *See Plumhoff*, 134 S. Ct. at 2023.

To be clearly established, the contours of a right must be "sufficiently definite that

any reasonable official in the defendant's shoes would have understood that he was

violating it." *Id.* "The salient question is whether the state of the law at the time of

[the] incident provided fair warning to the defendant[] that [his] alleged conduct

was unconstitutional." *Tolan*, 134 S. Ct. at 1866 (internal quotation marks omitted

and alterations adopted).

Fair warning is commonly provided by materially similar precedent from the

Supreme Court, this Court, or the highest state court in which the case arose. *See*

*Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012). However, a case directly

on point is not required as long as "existing precedent" placed the "constitutional

question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (internal

quotation marks omitted). *See also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th

Cir. 2010) ("[J]udicial precedent with materially identical facts is not essential for

the law to be clearly established.").

As suggested by the above discussion, there is no caselaw that would have

put Alech on notice that his conduct was unlawful. In support of his claim that

Alech violated "clearly established" law, Plaintiff cites *Priester v. City of Riviera*

*Beach*, 208 F.3d 919 (11th Cir. 2000); *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir.

2002); and *Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000). All of those cases

23

involved officers using force on individuals who were already handcuffed or otherwise securely in police custody. In *Priester*, the plaintiff was unarmed and presented no threat of harm as he immediately submitted to the police and complied with their instruction to lie down on the ground, but the defendant officer repeatedly ordered his dog to attack the plaintiff anyway. *Priester*, 208 F.3d at 923. In *Lee*, the defendant officer took the plaintiff—who already had been arrested and was secured in handcuffs—to the back of her car and slammed her head against the trunk. *Lee*, 284 F.3d at 1198. And in *Slicker*, the officers hit the plaintiff's head on the pavement, kicked him, and knocked him unconscious after he was handcuffed and in spite of the fact that he did not "resist, attempt to flee, or struggle with the officers in any way." *Slicker*, 215 F.3d at 1233.

No imminent danger confronted the defendant officers in the above cases, as it did Alech when he faced a subject who in the split second prior to the use of force (1) was armed with a gun he had pointed at Alech while crouched in a "threatening" position and (2) had ignored multiple commands to get on his knees and at least one command to drop the gun. Unlike the plaintiffs in *Lee* and *Slicker*, Santana was not secured and handcuffed when Alech shot him. And unlike the plaintiff in *Priester*, Santana was armed with a gun and crouched behind a wall, not lying on the ground complying with the commands given by officers, immediately prior to the shooting. Thus, neither *Priester*, *Lee*, nor *Slicker* could

24

have given Alech "fair warning" that his use of deadly force under the very different circumstances he faced while executing the search warrant at Santana's residence on March 7, 2012 was unconstitutional. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasizing that the "dispositive question is whether the violative nature of *particular* conduct is clearly established") (emphasis in original) (internal quotation marks omitted); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (reiterating the "longstanding principle that clearly established law should not be defined at a high level of generality" but rather "particularized to the facts of the case") (internal quotation marks omitted). As Plaintiff does not cite any other caselaw that could have put Alech on notice that his actions were unlawful, he has failed to meet his burden of showing the violation of a "clearly established" right.

## III.    Plaintiff's State Claims

### A.    Negligence

Plaintiff's negligence claim against the County is based on the same facts as his § 1983 illegal entry claim. Specifically, Plaintiff alleges that the officers negligently entered Santana's residence "by failing to give sufficient and adequate notice to the occupants inside the home that they were police officers."[4] Plaintiff apparently concedes that he can only succeed on his negligence claim if we reverse

---

[4] Plaintiff also claims that the officers "negligently failed to adequately secure the perimeter near the home prior to forcibly entering." However, he does not allege that any harm or damages resulted from that particular failure.

the district court's ruling that a no-knock entry was reasonable under the circumstances. Having affirmed the district court's holding on that issue, we likewise affirm the court's summary judgment order as to Plaintiff's negligence claim because Plaintiff cannot show that the County breached any duty to Santana related to the entry. *See Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007) ("To maintain an action for negligence, a plaintiff must establish that the defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages.").

## B.    Wrongful Death

Plaintiff's wrongful death claim against the County fails for similar reasons. Plaintiff argues the County is liable for Santana's death because: (1) the officers made an unlawful entry, imposing liability on the County for the events that occurred thereafter, and (2) there is a dispute of fact as to whether it was reasonable for Officer Alech to shoot Plaintiff under the circumstances. Having determined that the no-knock entry and the use of force were objectively reasonable under the circumstances, there is no basis for Plaintiff to prevail on his wrongful death claim. Accordingly, we affirm the district court's order granting summary judgment to the County on Plaintiff's wrongful death claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment on Plaintiff's § 1983 unlawful entry and excessive force claims and on his state negligence and wrongful death claims.