IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 14, 2025 Session

## STATE OF TENNESSEE v. JEFFERY LYNN LANE, JR.

**Appeal from the Circuit Court for Madison County**
No. 22-890    Donald H. Allen, Judge

_____

### No. W2023-01708-CCA-R3-CD

_____

The Defendant, Jeffery Lynn Lane, Jr., was convicted in the Madison County Circuit Court of possession of a firearm after having been convicted of a felony crime of violence, driving without a license, and driving without proof of insurance and received an effective twelve-year sentence to be served at eighty-five percent release eligibility. On appeal, he claims that the evidence is insufficient to show he possessed the firearm, that the trial court erred by denying his motion to suppress evidence, and that the trial court committed plain error by allowing the State to introduce evidence of uncharged offenses. Based upon the oral arguments, the record, and the parties' brief, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

William W. Gill and Raven Prean-Morris (on appeal), Assistant Public Defenders – Appellate Division, Franklin, Tennessee, and Austin W. Bethany (at trial), Assistant District Public Defender, Jackson, Tennessee, for the appellant, Jeffery Lynn Lane, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Jacob Durst, Strategic Litigation Counsel; Jody S. Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case relates to the Defendant's crashing a car into a light pole and a police officer's subsequently observing a nine-millimeter pistol in plain view in the wrecked car. The officer searched the car and obtained the pistol and more than one hundred rounds of

nine-millimeter ammunition. In October 2022, the Madison County Grand Jury indicted the Defendant for possession of a firearm after having been convicted of a felony crime of violence, a Class B felony, and driving without a valid license and violating the financial responsibility law, both misdemeanors. Two days before trial, the Defendant filed a motion to suppress the evidence. The trial court held a hearing and denied the motion.

At trial, Deputy Christian McAlister with the Weakley County Sheriff's Office testified that in May 2022, he was a patrol officer for the Jackson Police Department ("JPD"). About 10:00 p.m. on May 23, Officer McAlister was dispatched to a residential area on Beverly Hills Drive for a vehicle wreck with injuries. When he arrived, he saw a four-door sedan several feet off the roadway and the Defendant thirty to forty yards from the sedan. The Defendant was standing in the middle of the road, talking with people. Officer Jacob McDowell arrived at the same time as Officer McAlister and went to speak with the Defendant while Officer McAlister went to assess the damage to the sedan. The sedan had crashed "head-on" into a light pole. The front of the car was "smashed in," and both front airbags had deployed. Officer McAlister said the sedan appeared to be "totaled" and could not be driven from the scene. The light pole was intact but split and would have to be replaced.

Officer McAlister testified that in assessing damage to a vehicle, he always started at the driver's door and worked his way around the vehicle. In this case, he looked through a window and saw "papers everywhere" and "miscellaneous items." He also saw a handgun and a "fanny pack" on the front passenger floorboard. Emergency Medical Services ("EMS") arrived to evaluate the Defendant, who was the driver of the sedan, so Officer McAlister obtained gloves from the ambulance and retrieved the gun and fanny pack. The gun was a nine-millimeter Taurus and was loaded with fifteen rounds in the magazine and one round in the chamber. Officer McAlister told another officer to "run a 10-29 check" on the gun to determine if the gun's serial number had been reported stolen. The fanny pack contained more than one hundred rounds of ammunition. Officer McAlister found marijuana crumbles, also known as "shake," in the front passenger seat and a small marijuana clump, also known as a "bud," in a clear plastic baggie. The baggie was beside the gun and fanny pack on the front passenger floorboard. The field weight of the marijuana was .1 gram.

Officer McAlister testified that the Defendant was unable to provide proof of insurance and did not have a valid driver's license. Officer McAlister checked the Defendant's criminal history and learned he had a prior conviction for a felony. At that point, Officer McAlister decided to arrest him. Officer McAlister advised the Defendant that he was under arrest for being a felon in possession of a handgun and told him several times to put his hands behind his back. The Defendant "tens[ed] up," refused to surrender one of his arms, and insisted that the car did not belong to him.

- 2 -

Officer McAlister testified that at some point prior to the Defendant's arrest, he asked the Defendant about the owner of the car. The Defendant said only that "it's not my vehicle." Officer McAlister told the Defendant that he needed the car's registration and insurance information, but the Defendant stated multiple times, "[I]t's not my vehicle." Officer McDowell had to help Officer McAlister take the Defendant into custody, and a physical altercation occurred in which "two strikes [were] thrown to try to get [the Defendant] under control until eventually the fight went to the ground." During the melee, Officer McAlister's body camera was knocked off his chest. Officer McAlister said that he arrested the Defendant for being a felon in possession of a firearm, driving without a license, and violating the financial responsibility law and that the Defendant was "completely" uncooperative during the arrest. Officer McAlister did not charge the Defendant for possessing marijuana, a misdemeanor, due to the more serious offense of being a felon in possession of a firearm.

The State played Officer McAlister's body camera video and introduced the video into evidence. The video began at 9:57 p.m. and showed that Officer McAlister walked from the wrecked sedan to the ambulance. He entered the back of the ambulance at 9:58 p.m., obtained a purple glove, exited the ambulance, and told another officer that "we're going to tow it and inventory it anyways, so we're getting into it." Officer McAlister returned to the sedan, opened the front passenger door, and inspected items that were on the front passenger seat. He moved the passenger-side airbag, which was not obscuring the floorboard completely, and picked up the gun. He unloaded the weapon, put the gun on the front passenger seat, and asked an officer to conduct a "29 check on that for me." The officer picked up the gun to record the serial number and put the gun back on the seat. Officer McAlister found the baggie of marijuana on the front floorboard, opened the fanny pack that also was on the floorboard, and found ammunition in the fanny pack. He then opened the glove box and asked about insurance. The other officer told him that the Defendant claimed the car belonged to a friend. Officer McAlister responded, "I'll have to go cite him at the hospital for no insurance." Officer McAlister continued searching the car and asked bystanders to move away from the sedan because "we just got a little gun and some other things that we shouldn't have."

The video showed that at 10:07 p.m., Officer McAlister asked another officer to go to the hospital and "cite" the Defendant for not having insurance. The officer advised Officer McAlister that the Defendant was not going to the hospital. Officer McAlister asked if anyone had checked the Defendant's identification, and the officer stated that the Defendant's license was suspended. Officer McAlister said that "technically we could charge him for that little baggie of dope and that gun." He went on to say, "It's a baggie of dope where the dope's already been smoked. It's technically paraphernalia with a handgun. It's a stretch. The handgun's clear. . . . I'm still trying to decide what I want to

do with this gun." He asked the other officer if the Defendant had a criminal history and told the officer to "run him on the CAD." At 10:15 p.m., Officer McAlister learned the Defendant had a prior felony conviction. At 10:17 p.m., Officer McAlister approached the Defendant and advised him that he was under arrest for being a felon in possession of a handgun. The video showed the Defendant resisting arrest and showed Officers McAlister and McDowell taking him into custody.

On cross-examination, Officer McAlister testified that he arrived at the scene within two or three minutes of the dispatch and that the Defendant appeared to be injured and waiting for the police or an ambulance. Officer McDowell told Officer McAlister that the Defendant confessed to being the driver of the sedan, but Officer McAlister never determined who owned the car. Defense counsel asked if Officer McAlister attempted to learn the owner's name, and Officer McAlister responded,

> To the best of my ability, without any kind of insurance information, you can run the tag and get a name. I don't remember any specifics of if we had success or not. I do not believe we were ever able to locate it and based upon that is [why] we had it towed.

Officer McAlister said he was unable to obtain the owner's telephone number because the Defendant was uncooperative.

Officer McAlister testified that in assessing the damage to the sedan, he noticed that everything inside the car had been "thrown around the vehicle from the impact." He acknowledged that the gun was partially obscured by the passenger seat and the deployed airbag, that he did not know where the gun was located before the crash, and that the gun could have been under the front passenger seat. Officer McAlister did not try to identify the owner of the gun. He never saw the Defendant with the gun, and he did not know if the gun was tested for fingerprints. Officer McAlister arrested the Defendant after the ambulance left the scene, and he did not remember if an officer subsequently transported the Defendant to the hospital.

On redirect-examination, Officer McAlister testified that the handle or grip of the gun was visible "clear as day" to someone standing outside the sedan or sitting in the driver's seat. On recross-examination, Officer McAlister testified that the Defendant initially said the sedan did not belong to him and later said that "it's my friend's car."

Officer Jacob McDowell of the JPD testified that he responded to the scene and saw a silver SUV parked at the intersection of Beverly Hills Drive and Village Wood. The Defendant got out of the passenger side of the SUV and walked toward Officer McDowell. The Defendant had "a pretty significant limp" and appeared to be injured. Officer

McDowell asked the Defendant if anyone else was in the wrecked car, and the Defendant said he was the driver and sole occupant. While Officer McDowell was speaking with the Defendant, Officer McAlister was "over checking the car."

Officer McDowell testified that medical personnel assessed the Defendant in or near an ambulance while Officer McAlister began searching the car. The Defendant would have been unable to see the search from the ambulance. After EMS released the Defendant, Officer McDowell began preparing citations for driving without a valid license and driving without proof of insurance. While Officer McDowell was filling out the paperwork, Officer McAlister approached him and said that "we are going to take him in." Officer McDowell had to assist with the arrest because the Defendant was uncooperative. After the Defendant was placed into the back of a patrol car, Officer McDowell searched him and found a half-pint bottle of whiskey in his jacket pocket and a set of car keys. Officer McDowell had noticed while he was talking with the Defendant that the Defendant's eyes were "glassy" and that "[t]here was a faint smell commonly associated with alcohol." Officer McDowell said that the Defendant also was "a little wobbly" but that "some of that could be attributed to . . . the injures."

On cross-examination, Officer McDowell acknowledged that the Defendant was cooperative when the officers first arrived on the scene and that the Defendant provided his identification. The Defendant had "a real bad limp" and obvious leg pain. Officer McDowell said that the Defendant "did a lot of balancing and hopping around" but that the Defendant's leg injury could have affected his ability to stand. Officer McDowell did not administer field sobriety tests to the Defendant or charge him with driving under the influence ("DUI"), and he did not know if the gun was tested for fingerprints. The car was a 2002 Buick LeSabre, and the license tag would have been called into dispatch. However, Officer McDowell did not know if the owner was located. On redirect-examination, Officer McDowell testified that he did not recall the Defendant's ever giving him the name of the car's owner.

At the conclusion of Officer McDowell's testimony, the State read a stipulation of fact to the jury. The stipulation provided that the Defendant had a prior conviction for a felony crime of violence in the Madison County Circuit Court on January 14, 2008. The State rested its case-in-chief.

The Defendant testified that on the night of May 23, 2022, he wrecked the car he was driving after leaving his girlfriend's house. He explained that a wasp got into the car and flew toward his face, that he "meant to hit the brakes" but "hit the gas," and that he "ran into a pole." The Defendant said that his glasses "flew off" from the impact and that he "really couldn't see everything that was going on." The airbags deployed, and the car was "totaled." A man came out of a nearby house to make sure the Defendant was okay,

- 5 -

and the Defendant told him to call the police. The Defendant's girlfriend pulled up around the corner in her silver SUV, so the Defendant sat in her SUV while he waited for the police to arrive.

The Defendant testified that he had borrowed the car from his friend, Danielle. He did not look through the car before he borrowed it, and he did not know the gun was inside. He acknowledged that he stipulated to having a prior conviction for a felony crime of violence and that he knew he could not legally possess a firearm. The Defendant noted that he did not leave the scene. He said he waited for the police to arrive because "that pole looked like it was about the fall," he "didn't want to have no hit and run type situation," and he "wasn't trying to get locked back up." The police arrested him for possessing a firearm he did not even know existed, and one of the officers grabbed him. He acknowledged that he was upset when the officers took him into custody and that his "emotions [got] the better of [him]." The officers did not administer field sobriety tests and did not charge him with DUI.

On cross-examination, the Defendant testified that he borrowed the car from Danielle about 7:00 p.m. to go to his girlfriend's house and that he was at his girlfriend's home for about three hours to help her son with basketball practice. His girlfriend lived on Norton Drive, which was only a two-minute drive from the wreck site on Beverly Hills Drive. When the Defendant left his girlfriend's house, he threw his pair of basketball shorts onto the backseat and began making the five-minute drive to Patrician Terrace to return the car to Danielle. The State asked if the gun belonged to Danielle, and the Defendant responded, "I guess." He then said he did not know who owned the gun. The Defendant acknowledged that Officer McAlister's body camera video showed that the gun was clearly visible on the floorboard. He said, though, that it was dark outside, that he was "like . . . legally blind," and that the air bag knocked off his glasses. He did not see anything on the floorboard before the wreck and would not have driven the car if he had known the gun was inside. He acknowledged that he asked Danielle for permission to drive the car.

The Defendant testified that the wreck occurred because he lost control of the car while trying to avoid being stung by a wasp, not because he was intoxicated. He acknowledged that the road was straight and that the body camera video showed he had consumed most of the whiskey that was in his jacket pocket. He said the amount of alcohol he consumed would not have affected him because the bottle of whiskey was "little bitty" and because he weighed two hundred pounds. The Defendant said that, regardless, he did not consume the alcohol until he got into his girlfriend's SUV after the wreck. He consumed the alcohol to "dull the pain" from his injured leg.

The Defendant testified that he did not see Officer McAlister search the car but that he knew the officers would search it because "that's standard operating procedure." When

Officer McAlister told the Defendant that he was under arrest for being a felon in possession of a firearm, the Defendant told Officer McAlister that Officer McAlister did not ask for permission to search the car. The Defendant was angry when the officers arrested him because he did not do anything wrong.

On redirect-examination, the Defendant acknowledged that he assumed the officers were going to locate the owner of the car and, therefore, locate the owner of the gun. He also acknowledged that he may have been unsteady on his feet but said that he was disoriented and was having trouble with his vision due to the wreck. The Defendant said the small amount of alcohol he consumed did not have anything to do with his crashing the car into the pole.

Officer Olivia Johnson of the JPD testified on rebuttal for the State that she was responsible for accepting police reports from people over the telephone and from people who "walk in off of the streets." On May 24, 2022, Danielle Moffett came into the police department and reported that her ex-boyfriend, who was the Defendant, stole her 2002 Buick LeSabre about 7:00 p.m. the previous day and did not return the car. On cross-examination, Officer Johnson testified that she "ran" the LeSabre's license plate and that she learned the car had been involved in a wreck at 9:44 p.m. on May 23, 2022. She said she did not know the outcome of Ms. Moffett's report. At the conclusion of Officer Johnson's testimony, the jury convicted the Defendant as charged in the indictment.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his conviction of possession of a firearm after having been convicted of a felony crime of violence because the evidence fails to show he possessed the firearm. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

The indictment charged the Defendant with violating Tennessee Code Annotated section 39-17-1307(b)(1)(A), which provides that "[a] person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon[.]" The parties stipulated at trial that the Defendant had a prior conviction for a felony crime of violence in the Madison County Circuit Court on January 14, 2008.

Possession of a firearm can be either actual or constructive. *See State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). "[A]ctual possession refers to physical control over an item." *Id*. To find constructive possession, the State must show that the accused knowingly had the power and intention at a given time to exercise dominion and control over the object directly or through others. *State v. Copeland*, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). "In other words, 'constructive possession is the ability to reduce an object to actual possession.'" *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). "The mere presence of a person in an area where [an object is] discovered is not, alone, sufficient to support a finding that the person possessed the [object]." *Id*. Constructive possession depends on the totality of the circumstances and may be proven by circumstantial evidence. *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013). "Elements of possession for purposes of constructive possession are questions of fact for the jury and are rarely susceptible to direct proof." *State v. Killebrew*, No. W2003-02008-CCA-R3-CD, 2004 WL 1196098, at \*3 (Tenn. Crim. App. May 26, 2004), *no perm. app. filed*.

The Defendant did not actually possess the handgun. He claims that the evidence is insufficient to establish he constructively possessed the handgun because the State failed

to show he had the ability and intent to exercise dominion and control of the gun, because the State failed to show that he knew the gun was under the passenger seat prior to the crash, because multiple individuals possessed or occupied the car before the wreck, and because the police officers made no attempt to ascertain the ownership of the gun or car. In support of his claims, he repeatedly cites *State v. Siner*, No. W2020-01719-CCA-R3-CD, 2022 WL 252354, at *5 (Tenn. Crim. App. Jan. 27, 2022), *no perm. app. filed*.

In *Siner*, the police stopped the defendant's girlfriend for speeding. *Id*. at *1. The defendant was sitting in the front passenger seat, and a woman was sitting in the backseat. *Id*. Police officers smelled marijuana, searched the car, and found oxycodone pills in the center console "underneath a pile of paperwork" and a loaded gun underneath the front passenger seat. *Id*. The firearm was within reach of the defendant and the woman sitting in the backseat. *Id*. The defendant argued at trial that the State could not show he constructively possessed items that were hidden from plain view in a car in which he was merely a passenger, but the jury convicted him of simple possession of oxycodone and possession of a firearm after having been convicted of a crime of violence. *Id*. at *1, 4. On appeal, this court found the evidence insufficient to support the conviction for possession of a firearm because there was no evidence linking the defendant to the gun or suggesting that he was aware the gun was in the car. *Id*. at *7. This court noted that the police did not attempt to obtain fingerprints from the gun or establish the gun's ownership, that the defendant was neither the driver nor the owner of the car, that the gun was not in plain view, and that the defendant never made any movements to indicate he was reaching under his seat where the gun was found. *Id*. This court also reversed the defendant's conviction for possession of oxycodone for similar reasons, noting that the pills had been prescribed to the driver's mother, that the pills were under a pile of papers in the center console, and that there was no evidence that the defendant ever accessed the center console or knew the pills were present. *Id*. at *7.

The instant case is factually distinguishable from *Siner*. Taken in the light most favorable to the State, the evidence established that the Defendant was the driver and sole occupant of the car in which the gun was found. "'Knowledge may be inferred from control over the vehicle in which the contraband is secreted.'" *Id*. at *5 (quoting *State v. Brown*, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995)). The Defendant, by his own testimony, was in possession of the car for three hours before the crash and had additional property in the vehicle. Moreover, he acknowledged that the handle of the firearm was in plain view on the front passenger floorboard, beside the driver's seat. Although the Defendant testified that "Danielle" owned the car and that he assumed the officers would locate the owner of the gun by locating the owner of the car, he never provided the owner's name to Officer McDowell or Officer McAlister. The jury later learned that Ms. Moffett reported the car stolen by the Defendant. It is the province of the jury to assess the credibility of the witnesses, and the jury obviously chose not to accredit the Defendant's testimony. Given

- 9 -

the proof, it was reasonable for the jury to conclude that the Defendant constructively possessed the firearm. Thus, the evidence is sufficient to support the conviction.

## II. Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress evidence. The State argues that the trial court properly denied the motion. We agree with the State.

In his motion to suppress, the Defendant claimed that the seizure of the gun was the result of an illegal warrantless search and that the plain view doctrine did not apply because the deployed air bag prevented Officer McAlister from seeing the gun on the floorboard. The State filed a response to the motion, arguing that the gun was in plain view and that discovery of the evidence was inevitable because the police would have searched the car incident to the Defendant's arrest for DUI or prior to the car's being towed from the scene.

At the suppression hearing, Officer McAlister testified that he arrived at the location of the single-vehicle wreck about 10:00 p.m. The car appeared to have hit a light pole "head on," and the officer saw significant damage to the car and the pole. The Defendant, who was the driver, was standing in the middle of the road and was talking with people. The Defendant was complaining of leg pain, and an ambulance arrived to evaluate his injuries.

Officer McAlister testified that he went to look at the damage to the car. It was dark outside, but streetlights were on, and he had a flashlight. He said that both airbags had deployed, that the car was "[d]efinitely total[ed]," and that the car was not drivable. The State asked how an undrivable vehicle would be removed from a scene, and he answered, "I usually give them the opportunity to choose who they would like to tow the vehicle, and if they cannot come up with a solution, then the department will tow the vehicle." Prior to having a vehicle towed, Officer McAlister would conduct an inventory search to protect the police department from liability if valuable property, such as money, turned up missing.

Officer McAlister testified that the car was in "someone's yard." While standing outside the car, he looked inside and noticed that "the collision had launched everything that was probably in the seats, under the seats, visors, just everything [was] just thrown all over the vehicle." He saw papers, a handgun, and a fanny pack, and he was able to see the gun without disturbing the car. At some point at the scene, Officer McAlister learned the Defendant was a convicted felon. He acknowledged that he searched the car and that he did so for two reasons: (1) to inventory the vehicle prior to the police department's having it towed and (2) because the Defendant was a felon in possession of a firearm.

- 10 -

Officer McAlister testified that while he was with the car, Officer McDowell spoke with the Defendant and noticed an odor of alcohol coming from the Defendant's person. Officer McAlister acknowledged that there was evidence the Defendant was intoxicated and that he would have arrested the Defendant for DUI if he had not arrested the Defendant for being a felon in possession of a firearm. He said he did not remember if he concluded that the Defendant was driving under the influence before or after he learned the Defendant was a convicted felon. He acknowledged, though, that the Defendant was "going to end up going to jail that night one way or another[.]"

Officer McAlister testified that he found a "very small amount" of marijuana in the car during his search. However, he chose not to charge the Defendant with possession of marijuana or DUI, which were misdemeanors, due to the more serious charge of being a felon in possession of a firearm. When Officer McAlister told the Defendant that the Defendant was under arrest, the Defendant resisted. A physical altercation occurred, and the Defendant "was struck and then taken to the ground."

On cross-examination, Officer McAlister testified that when he first arrived at the scene, he immediately walked to the wrecked car and that he "[m]ore than likely" went to the driver's side. He did not open the driver's door and walked around the vehicle. After he assessed the damage, he asked the Defendant if he could retrieve the registration information from inside the car. The Defendant only responded that "it's not my car." Officer McAlister returned to the car and saw the gun inside. Defense counsel asked if Officer McAlister had to move the deployed airbag in order to see the gun, and he stated, "[M]y personal opinion, you can see the firearm handle, the grip of the handle of the firearm between the little gap of the seat and the -- the airbag. So, I wouldn't say you have to completely move the airbag."

Officer McAlister testified that he thought he saw the gun from the passenger-side window. He acknowledged that he testified at the Defendant's preliminary hearing, and defense counsel played a portion of his recorded testimony. Officer McAlister acknowledged testifying at the hearing that he saw the gun from the driver's side. He explained, "If I stated there the driver's side, then I'm going to have to go with the driver's side. I won't go back on my [preliminary hearing testimony] because that was fresh in my memory there." Defense counsel asked if he immediately retrieved the gun, and he answered, "I usually don't try to touch anything without gloves. . . . I believe I went to go to the ambulance to get gloves." After he obtained the gloves, he entered the passenger side of the car and retrieved the gun.

Defense counsel asked if Officer McAlister searched any other area of the car before he retrieved the gun, and he said no. Defense counsel then played a portion of Officer McAlister's body camera video, and Officer McAlister acknowledged that he did not

retrieve the gun immediately after he entered the car. Instead, the video appeared to show him searching the front passenger seat. Officer McAlister stated, "I'm not going to say I searched the vehicle, but I'm not sure what I was doing in the seat." At the time of the search, the Defendant was not under arrest, Officer McDowell had not yet told Officer McAlister about the Defendant's possible intoxication, and Officer McAlister did not suspect the Defendant of any wrongdoing. Officer McAlister said he always conducted an inventory search before towing a car from a scene. He did not administer field sobriety tests to the Defendant or charge the Defendant with DUI.

On redirect-examination, Officer McAlister acknowledged that the police found a small bottle of Jack Daniel's whiskey in the Defendant's pocket after the Defendant's arrest. The State asked Officer McAlister if he had any doubt that he saw the gun by looking through a window on either the driver or passenger side of the car, and he said no. On recross-examination, defense counsel asked, "If you observed the firearm from outside the vehicle, why then did you not go straight to the firearm and retrieve it?" Officer McAlister responded, "I'm not sure."

Upon being questioned by the trial court, Officer McAlister testified that the Defendant never admitted to him that the Defendant was driving the car. The Defendant stated only that "it's not my vehicle; it's not my vehicle."

After Officer McAlister's testimony, defense counsel argued that the plain view doctrine did not apply because Officer McAlister's body camera video did not show the gun in plain view as the officer claimed and because the officer did not know when he saw the gun that the Defendant was a convicted felon. The State asserted that the evidence was admissible under either the plain view or the inevitable discovery doctrines. Regarding the plain view doctrine, the State noted that Officer McAlister's body camera video showed him obtaining a glove from the ambulance and walking directly to the front passenger door of the car to retrieve the firearm, which supported his testimony that he had seen the gun in plain view on the front passenger floorboard. Regarding the inevitable discovery doctrine, the State asserted that Officer McAlister would have found the gun during a search of the car as part of the ongoing DUI investigation; would have found the gun during an inventory search prior to having the car towed from the scene; and would have learned the Defendant was a convicted felon so that "the nature of the contraband would have become apparent" to Officer McAlister.

The trial court accredited Officer McAlister's testimony orally and in a written order. The trial court found that Officer McAlister saw the gun in plain view while he was standing outside the vehicle and, therefore, the evidence was admissible under the plain view doctrine. In the alternative, the trial court found that the JDP would have towed the car from the scene and that the officers were conducting an ongoing investigation of the

Defendant for DUI; therefore, Officer McAlister inevitably would have discovered the evidence in the car during an inventory search or as part of the DUI investigation. Accordingly, the trial court denied the motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the Defendant, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against "unreasonable searches and seizures." In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. *State v. Richards*, 286 S.W.3d 873, 878 (Tenn. 2009). However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed. *State v. Keith*, 978 S.W.2d 861, 865 (Tenn. 1998). The recognized exceptions to the requirement include a search incident to an arrest, the plain view doctrine, consent to the search, a Terry stop and frisk, and the existence of exigent circumstances. *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007).

Items fall within the "plain view" exception to the warrant requirement if:

(1) the officer did not violate constitutional mandates in arriving at the location from which the evidence could plainly be seen; (2) the officer had a lawful right of access to the evidence; and (3) the incriminating character of the evidence was "immediately apparent," i.e., the officer possessed probable cause to believe that the item in plain view was evidence of a crime or contraband."

*State v. Coulter*, 67 S.W.3d 3, 43 (Tenn. Crim. App. 2001) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). On appeal, the Defendant challenges the third

factor, that the incriminating nature of the evidence was immediately apparent to the officer.

Here, the trial court accredited Officer McAlister's testimony that he saw the handle of the gun on the floorboard while he was assessing the damage to the car. However, simply seeing the gun in plain view was not a sufficient basis for the evidence to be admissible under the plain view doctrine. It was undisputed that Officer McAllister did not know when he saw the gun that the Defendant was a convicted felon. Therefore, the incriminating character of the gun was not immediately apparent, and the trial court erred by finding that the evidence was admissible under the plain view doctrine.

"[T]he 'exclusionary rule' generally provides that any evidence that was obtained unlawfully should be suppressed and excluded for the purposes of a criminal prosecution." *State v. Scott*, 619 S.W.3d 196, 204 (Tenn. 2021) (citing *Hudson v. Michigan*, 547 U.S. 586, 590 (2006)). The "inevitable discovery doctrine" is "an exception to the exclusionary rule that applies when 'the evidence in question would inevitably have been discovered without reference to the police error or misconduct.'" *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 448 (1984)). The doctrine allows illegally obtained evidence to be admitted if the State can show by a preponderance of the evidence that the evidence ultimately or inevitably would have been discovered by lawful means. *Id.* In order for the doctrine to apply, "[t]he ultimate test is whether the evidence would have been discovered through an independent, proper avenue that comports with the Fourth Amendment." *Id.* As our supreme court has explained, "This fact-specific inquiry requires [the appellate court] to examine if the record provides sufficient proof that the evidence *would have*, not just *could have*, been inevitably discovered through independent lawful means." *Id.* at 205.

At the suppression hearing, the trial court agreed with the State that the evidence was admissible under the inevitable discovery doctrine because Officer McAllister would have discovered the gun during his inventory search of the car, which the JPD had to have towed from the scene, and during a search of the car as part of the ongoing DUI investigation. At oral arguments, the State advised this court that it was abandoning its contention that the gun inevitably would have been discovered during an inventory search. Instead, the State argues on appeal that Officer McAlister inevitably would have learned the Defendant was a convicted felon and, therefore, would have seized the gun lawfully for his being a felon in possession of a firearm. The State also argues for the first time that Officer McAlister inevitably would have discovered the Defendant's intoxication and, therefore, would have seized the gun lawfully for his possessing a handgun while under the influence of alcohol in violation of Tennessee Code Annotated section 39-17-1321(a) and that Officer McAlister's community caretaking function allowed him to seize the handgun temporarily before he developed probable cause to seize the weapon

permanently.[1]  However, as noted by the Defendant in his reply brief, issues raised by the State for the first time on appeal are waived.  Tenn. R. App. P. 3(e); *see State v. Boyd*, 700 S.W.3d 104, 116 (Tenn. Crim. App. 2024).  Therefore, we will not consider the State's latter two arguments.

Nevertheless, we agree with the trial court that lawful seizure of the evidence was inevitable.  The Defendant had just "totaled" a car on a straight stretch of road in a residential neighborhood and had destroyed a light pole.  The car did not belong to him, and he was driving without a valid license or proof of insurance.  Officer McAlister saw a handgun in plain view on the floorboard of the car and had another officer check the gun's serial number to determine if the gun had been reported stolen.  Officer McAlister also ordered a computerized background check of the Defendant's identification and discovered that the Defendant was a convicted felon.  At that point, he decided to arrest the Defendant for being a felon in possession of a firearm.  Meanwhile, Officer McDowell noticed an odor of alcohol coming from the Defendant's person, that the Defendant's eyes were glassy, and that the Defendant was unsteady on his feet.  The entire episode lasted less than twenty minutes.  Therefore, we conclude that even if Officer McAlister did not suspect the Defendant of any wrongdoing when Officer McAlister observed the handgun in plain view, Officer McAlister certainly would have checked the Defendant's criminal history and would have learned the Defendant had a prior felony conviction, which inevitably would have led to the Defendant's arrest for being a felon in possession of a firearm, the lawful seizure of the handgun, and the lawful discovery of any contraband.  Accordingly, we conclude that the trial court properly denied the motion to suppress.

## III.  Uncharged Offenses

Finally, the Defendant claims that the trial court committed plain error by allowing the jury to hear evidence of uncharged offenses in violation of Tennessee Rules of Evidence 401, 402, and 404(b).  Specifically, the Defendant contends that the trial court erred by allowing the State to introduce evidence that he committed DUI, resisted arrest, assaulted a police officer, and possessed marijuana.  The State argues that the Defendant has not shown plain error.  We agree with the State.

During Officer McAlister's trial testimony, defense counsel objected to the State's playing the officer's entire body camera video.  Defense counsel advised the trial court that the jury was going to hear that the Defendant "had been drinking" but argued that evidence in the video of the Defendant's driving under the influence was irrelevant because the

---

[1] The latter issue is currently pending before our supreme court.  *See State v. Washington*, No. W2022-01201-CCA-R3-CD, 2023 WL 8933232, at *5 (Tenn. Crim. App. Dec. 27, 2023), *perm. app. granted* (Tenn. July 9, 2024).

police did not charge him with DUI, the State did not indict him for DUI, and the defense was not contesting the cause of the accident. The State argued that the evidence was relevant, given the "expect[ed]" defense. The trial court ruled that the evidence was relevant to the cause of the accident and that the State could play the video except for the portions involving the Defendant's prior criminal history.

When the State sought to play Officer McDowell's body camera video during his testimony, defense counsel renewed the previous objection. The trial court ruled that the State could not play any portions of the video in which the officers talked about the Defendant's intoxication amongst themselves but that the State could play the portions of the video in which Officer McDowell talked directly with the Defendant. The trial court also ruled that the State could question Officer McDowell about his observations of the Defendant's possible intoxication.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait."

Ordinarily, we review rulings on the admissibility of evidence under an abuse of discretion standard. *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002) (citing *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997)). However, defense counsel only objected to evidence of the Defendant's intoxication. Defense counsel did not object to evidence of resisting arrest, assaulting a police officer, or possessing marijuana and did not raise any claim pursuant to Tennessee Rule of Evidence 404(b). *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. Evid. 103(a)(1) (providing that "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record"). Moreover, the Defendant did not raise the issue of uncharged offenses in his motion for new trial. *See* Tenn. R. App. P. 3(e). Therefore, we can only review the issue for plain error.

We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

The Defendant has failed to show that a substantial right of his was adversely affected or that consideration of the error is necessary to do substantial justice. The Defendant stipulated to having a prior conviction for a violent felony. Thus, the only issue for the jury to decide was whether he constructively possessed the firearm. At the time of the crash, the Defendant had been in possession of the car for three hours. He acknowledged that the firearm was clearly visible on the floorboard, and the video shows that the gun was accessible to him from the driver's seat. Although the Defendant testified that Danielle owned the car and that he did not know the gun was in the car, he did not reveal Danielle's name to the police or tell the officers that he did not know the gun was inside. Instead, when Officer McAlister told the Defendant that he was under arrest for being a felon in possession of a firearm, the Defendant stated that Officer McAlister did not have permission to search the car. Therefore, we conclude that the Defendant is not entitled to plain error relief.

## CONCLUSION

Upon our review, we affirm the judgments of the post-conviction court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE